**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATURAL RESOURCES DEFENSE COUNCIL, )
CITIZENS FOR PENNSYLVANIA'S FUTURE, )
ENVIRONMENTAL DEFENSE FUND, and )
SIERRA CLUB, )
                            )
            Petitioners     )
                            )    Case No. 25-1288
        v.                  )
                            )
U.S. DEPARTMENT OF ENERGY,  )
and CHRIS WRIGHT, in his official capacity as )
Secretary of Energy,        )
                            )
            Respondents.    )
                            )
                            )
                            )

**PETITION FOR REVIEW**

Natural Resources Defense Council, Citizens for Pennsylvania's Future, Environmental Defense Fund, and Sierra Club (collectively "Public Interest Organizations") petition the Court for review of the Department of Energy's and Secretary of Energy Chris Wright's (collectively, "DOE") Order No. 202-25-8 dated August 27, 2025 at 7:11 p.m. EDT (the "Order") (Exhibit A), any amendment, modification, or renewal of that Order, as well as any denials of petitions for rehearing.

Public Interest Organizations petition under section 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b), and section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and D.C. Circuit Rule 15(a). On September 26, 2025, Public Interest Organizations

1

timely moved to intervene and sought rehearing of the Order (Exhibit B). DOE issued a Notice of Denial of Rehearing By Operation of Law and Providing for Further Consideration on October 28, 2025 (Exhibit C).

The prerequisites for judicial review of this petition have therefore been met. As stated in DOE's Notice of Denial, Public Interest Organizations timely requested rehearing of the Order, and DOE denied the rehearing request. Ex. C. 16 U.S.C. § 825*l*(a). Public Interest Organizations' petition is filed within sixty days after the denial of rehearing. Id. § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are parties aggrieved by the Order, and venue is proper. Id. § 825*l*(a)-(b).

Dated: December 23, 2025

Respectfully Submitted,

*/s/ Gavin G. McCabe*[1]
Gavin McCabe (DC Cir. 53966)
Caroline Reiser (DC Cir. 62319)
Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
40 W. 20th Street
New York, NY 10011
gmccabe@nrdc.org
creiser@nrdc.org
sbhat@nrdc.org
kchen@nrdc.org
(212) 727-4529

---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

*/s/Tomas Carbonell*
Tomas Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tcarbonell@edf.org
tekelly@edf.org
(202) 387-3500

*/s/Danielle C . Fidler*
Danielle Fidler (Bar No. 62486)
Francis W. Sturges, Jr. (Bar No. 64964)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
dfidler@catf.us
fsturges@catf.us
(617) 624-0234
*Counsel for Citizens for Pennsylvania 's Future*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Sierra Club Environmental Law Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
(415) 977-5646

# RULE 26.1 DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Natural Resources Defense Council states that it is a non-profit environmental organization. NRDC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Citizens for Pennsylvania's Future ("PennFuture") is a non-profit organization that works to aid the transition to a clean energy economy in Pennsylvania and beyond; to protect our air, water, and land; and to empower citizens to build sustainable communities for future generations. PennFuture has no parent corporation and no publicly held corporation has a 10% or greater ownership interest in PennFuture.

Environmental Defense Fund states that it is a 50l(c)(3) non-profit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of law, policy, science, and economics. Environmental Defense Fund has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies and no publicly

held company has a 10% or greater ownership interest in Sierra Club.

Dated: December 23, 2025

Respectfully Submitted,

/s/ Gavin G. McCabe[2]
Gavin McCabe (DC Cir. 53966)
Caroline Reiser (DC Cir. 62319)
Simi Bhat (DC Cir. No. 55968)
Karen Chen
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
gmccabe@nrdc.org
creiser@nrdc.org
sbhat@nrdc.org
kchen@nrdc.org
(202) 727-4529

/s/Tomas Carbonell
Tomas Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tcarbonell@edf.org
tekelly@edf.org
(202) 387-3500

/s/Danielle C . Fidler
Danielle Fidler (Bar No. 62486)
Francis W. Sturges, Jr. (Bar No. 64964)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
dfidler@catf.us
fsturges@catf.us
(617) 624-0234
Counsel for Citizens for Pennsylvania 's Future

/s/ Gregory E. Wannier
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Sierra Club Environmental Law Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
(415) 977-5646

---

[2] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

## CERTIFICATE OF COMPLIANCE WITH TYPE-FACE AND TYPE-STYLE REQUIREMENTS

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2507 in Times New Roman, Size 14.

Dated: December 23, 2025                    Respectfully submitted,

_/s/ Gavin G. McCabe_
Gavin G. McCabe

# CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statements** and all attachments with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have on this 23rd day of December, 2025, caused copies of the foregoing to be served via certified priority mail, return receipt requested, upon the Department of Energy and Secretary Chris Wright at:

> U.S. Department of
> Energy 1000
> Independence Ave.,
> SW Washington, DC
> 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also served a copy of the foregoing on all parties to the proceeding before the DOE via first-class certified mail and via electronic mail.

David S. Lapp
  People's Counsel
William F. Fields
  Deputy People's Counsel
Alexis H. Lewis
  Assistant People's Counsel
MARYLAND PEOPLE'S COUNSEL
Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, Maryland 21202
(410) 767-8150
William.fields@maryland.gov
Philip.sussler@maryland.gov

Brian O. Lipman
  Director Division of Rate Counsel
Emily Lam, Esq.
T. David Wand, Esq.
Robert Glover, Esq.
NEW JERSEY DIVISION OF RATE
COUNSEL
New Jersey Division of Rate Counsel
140 East Front Street, 4th Floor
P.O. Box 003
Trenton, NJ 08625
(609) 984-1460
elam@rpa.nj.gov
dwand@rpa.nj.gov
blipman@rpa.nj.gov
rglover@rpa.nj.gov

David Crumplar, (Bar ID No. 5876)
  Deputy Attorney General
ATTORNEY FOR THE DELAWARE
DIVISION OF THE PUBLIC
ADVOCATE
8820 N. French St., 6th Floor
Wilmington, DE 19801
(302) 577-8400
david.crumplar@delaware.gov

Jason E. James
  Assistant Attorney General
Kimberly Janas
  Counsel to the Attorney General
ILLINOIS OFFICE OF THE
ATTORNEY GENERAL
Office of the Illinois Attorney General
201 W. Pointe Drive, Suite 7
Bellville, IL 62226
(217) 843-0322
jason.james@ilag.gov

Eric DeBellis
  General Counsel Illinois Citizens
Utility Board
ILLINOIS CITIZENS UTILITY
BOARD
309 West Washington Street Suite 800
Chicago, IL 60606
edebellis@citizensutilityboard.org

Tyson Slocum
Public Citizen, Inc.
215 Pennsylvania Ave SE
Washington, DC 20003
(202) 454-5191
tslocum@citizen.org

| | |
|---|---|
| Michael E. Bryson<br>  Senior Vice President, Operations<br>PJM Interconnection, L.L.C.<br>2750 Monroe Boulevard<br>Audubon, PA 19403<br>(610) 666-4659<br>Michael.Bryson@pjm.com | Carrie Hill Allen<br>  Sr. Vice President & Deputy General<br>Counsel<br>Constellation Energy Generation, LLC<br>250 Massachusetts Ave. NW, Suite<br>760 Washington, D.C. 20001<br>carrie.allen@constellation.com |

Dated: December 23, 2025

Respectfully submitted,

*/s/ Gavin G. McCabe*
Gavin G. McCabe

# Exhibit A



## Department of Energy
Washington, DC 20585

### Order No. 202-25-8

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA), 16 U.S.C. § 824a(c), and section 301(b) of the Department of Energy Organization Act, 42 U.S.C. § 7151(b), and for the reasons set forth below, I hereby determine that an emergency exists in the PJM Interconnection, L.L.C. (PJM) region due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes. Issuance of this Order will meet the emergency and serve the public interest.

*Order No. 202-25-4*

The Eddystone Generating Station is a power plant owned by Constellation Energy Corporation (Constellation Energy) and located in Eddystone, PA. Units 3 and 4 (Eddystone Units), each with 380 MW of generation capacity, are subcritical steam boiler-turbine generator units that can run on either natural gas or oil, depending on market conditions. The Eddystone Units were initially scheduled for retirement on May 31, 2025.

Order No. 202-25-4, issued pursuant to FPA section 202(c), required that the Eddystone Units remain in operation for 90 days, until August 28, 2025. That order was based on my determination that emergency conditions existed in the PJM region. I explained that there was a potential shortage of electric energy and shortage of facilities for generation of electric energy. I stated that the potential loss of power to homes and local businesses presents a risk to public health and safety. I determined that the operational availability and economic dispatch of the Eddystone Units is necessary to best meet the emergency and serve the public interest. My determination was based on a number of different facts.

First, in congressional testimony, PJM's president and CEO recently stated that its system faces a "growing resource adequacy concern" due to load growth, the retirement of dispatchable resources, and other factors.[1] He stated that, through 2030, PJM anticipates reliability risk from increasing electricity demand, generator retirement outpacing new resource construction, and characteristics of resources in PJM's interconnection queue.[2] Upcoming retirements, including the planned retirement of the Eddystone Units, would exacerbate these resource adequacy issues.

---

[1] *Keeping the Lights On: Examining the State of Regional Reliability,* Before the *H. Comm. on Energy and Com., S. Comm. on* Energy, 119th Cong. (Mar. 25, 2025) (testimony of Mr. Manu Asthana, President and CEO of PJM Interconnection) (Asthana Test.) at 4-5, available at
https://www.congress.gov/119/meeting/house/118040/witnesses/HHRG-119-IF03-Wstate-AsthanaM-20250325.pdf.
[2] *Id.*

Second, PJM indicated that resource constraints could exist within its service territory under peak load conditions, stating that "available generation capacity may fall short of required reserves in an extreme planning scenario."[3] In its February 2023 assessment *Energy Transition in PJM: Resource Retirements, Replacements & Risks* (Four Rs Report)*,*" PJM highlighted increasing reliability risks in the coming years due to the "potential timing mismatch between resource retirements, load growth and the pace of new generation entry" under "low new entry" scenarios for renewable generation.[4]

Third, in December 2024, PJM filed revisions with the Federal Energy Regulatory Commission (FERC) to Part VII of its Open Access Transmission Tariff, known as the Reliability Resource Initiative (RRI), to address near-term resource adequacy concerns. In a February 2025 order, FERC accepted the revisions and found "the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry."[5]

*Continuing Emergency Conditions*

The emergency conditions that led to the issuance of Order No. 202-25-4 continue, both in the near and long term. The summer season has not yet ended, and the production of electricity from the Eddystone Units will continue to be critical to maintaining reliability in PJM this summer. This need is evidenced by the fact that the Eddystone Units were called on by PJM to generate electricity during heat waves that hit the region in June and July.

According to U.S. Environmental Protection Agency data, the Eddystone Units generated over 17,000 MWhs during the month of June.[6] Further, over a period of hot weather from June 23 to June 26, Unit 3 ran for a total of 65 hours and Unit 4 ran for a total of 59 hours.[7] During a hot weather period from July 28 to July 30, Unit 3 ran for 39 hours and Unit 4 ran 8 hours.[8]

Over the course of the summer, PJM has issued Hot Weather Alerts and/or Maximum Generation Alerts (EEA 1) covering a total of 20 days, including days in June, July, and August.[9] The hot weather may continue in the near term, as the Seasonal Outlook released by the National Oceanic and Atmospheric Administration (NOAA) on August 21, 2025, projects between a 40%

---

[3] *PJM Summer Outlook 2025: Adequate Resources Available for Summer Amid Growing* Risk, PJM Interconnection, L.L.C. (May 9, 2025), https://insidelines.pjm.com/pjm-summer-outlook-2025-adequate-resources-available-for-summer-amid-growing-risk/.

[4] *Energy Transition in PJM: Resource Retirements, Replacements & Risks,* PJM (Four Rs Report) at 1, (Feb. 24, 2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[5] *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084 (2025).

[6] *See Custom Data Download, EPA CAMPD* (Clean Air Markets Program Data), https://campd.epa.gov/data/custom-data-download (search criteria Emissions >> Monthly >> Unit (default) >>Apply >>"2025" and "June" (search date Aug. 22, 2025).

[7] *See PJM daily reports to DOE under Order No. 202-25-4, June 24-27, 2025.*

[8] *See PJM daily reports to DOE under Order No. 202-25-4, July 29-31, 2025.*

[9] *See* PJM Emergency Procedures Postings for the period between June 1 and August 31, *Emergency Procedures*, https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf (search range set to: effective from 06/01/2025 until 08/31/2025).

and 60% probability of above-normal temperatures in the Mid-Atlantic region, which includes the PJM region, over the next three calendar months.[10]

The evidence also indicates that there is a potential longer term resource adequacy emergency in the PJM region.

In its news release expressing support for Order No. 202-25-4, PJM explained that it has "repeatedly documented and voiced its concerns over the growing risk of a supply and demand imbalance driven by the confluence of generator retirements and demand growth. Such an imbalance could have serious ramifications for reliability and affordability for consumers."[11]

PJM has indeed voiced these concerns for years. In its February 2023 Four Rs Report, PJM cautioned that 40 GW of thermal generation are at risk of retirement by 2030.[12] PJM also noted that, while there were then 290 GW of renewable generation capacity in the PJM interconnection queue, historically, the rate of completion for renewable projects is approximately five percent.[13] PJM determined that the pace of new capacity additions "would be insufficient to keep up with expected retirements and demand growth by 2030."[14] PJM estimated that, depending on the pace of new capacity additions, reserve margin erosion would occur between 2026 and 2028.

More recently, in its December 2024 RRI filing with FERC, PJM stated that "[c]oncerns about resource adequacy . . . have only increased since the Four Rs Report . . . ."[15] PJM warned that its "resource adequacy concerns are increasing at an extraordinary pace."[16] PJM went on to explain, its "resource adequacy concerns are driven in large part by significant load growth caused by, among other things, large data centers" and that its preliminary analysis shows "substantial increases [in load additions] since the 2024 forecast" for both the summer and winter seasons.[17] According to PJM, "load growth and generator retirements are significantly outpacing the entry of new generation in the PJM Region with this trend expected to continue unabated based on all available evidence."[18] Although the RRI process will help expedite the construction of needed

---

[10] *Seasonal Outlook*, NOAA Climate Prediction Ctr., (Aug. 21, 2025), https://www.cpc.ncep.noaa.gov/products/predictions/long_range/seasonal.php?lead=1.

[11] *PJM Statement on the U.S. Department of Energy 202(c) Order of May 30*, PJM (May 31, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/2025-releases/20250531-doe-202c-statement-to-defer-retirements-of-certain-generators.pdf.

[12] Four Rs Report, *supra* n. 4, at 2.

[13] *Id.*

[14] *Id.* at 16, Table 1.

[15] *PJM Interconnection, L.L.C.*, FERC Docket No. ER25-712, Tariff Revisions for Reliability Resource Initiative at 10 (Dec. 13, 2024).

[16] *Id.*

[17] *Id.* at 10-11. *See also id.* at 13 ("the exponential load growth resulting from development of new data centers and the intense energy needs of Artificial Intelligence technology overshadows any relaxation in the pace of fossil fuel generation retirements…").

[18] *Id.* at 14.

new capacity, it is unlikely to result in the addition of any new generation capacity in the next few years.[19]

In support of the RRI filing, PJM submitted an affidavit from Donald Bielak, PJM's Director, Interconnection Planning. Mr. Bielak characterized the increase in forecasted load growth throughout PJM as "extraordinary" and "unprecedented," stating that it "could not have been foreseen as recently as a year ago."[20] Mr. Bielak expressed the opinion that the "rapid" retirement of thermal generation resources, "extreme" forecasted load growth, and "delays in new generation resources achieving commercial operation," would adversely affect resource adequacy throughout PJM's electricity grid.[21]

The North American Electric Reliability Corporation (NERC) has raised similar concerns. According to NERC's 2024 Long Term Reliability Assessment, "PJM could face future resource adequacy challenges, impacting system reliability and PJM's ability to serve load."[22] NERC assessed the PJM region at an elevated risk starting in 2026,[23] explaining that "[r]esource additions are not keeping up with generator retirements and demand growth."[24] NERC stated that the loss-of-load hour (LOLH) and expected unserved energy (EUE) risks are concentrated in the winter months (especially January), in both 2026 and 2028.[25]

Order 202-25-4 was preceded by executive orders on January 20, 2025, and April 8, 2025, in which President Donald J. Trump underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. Specifically, in Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[26] President Trump likewise recognized, in Executive Order 14156, "Declaring a National Energy Emergency," that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[27] The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure,

---

[19] *See id.*, Attachment C (Affidavit of Mr. Donald Bielak) ¶ 18-19 (explaining that projects studied in Transition Cycle #2, which includes RRI projects, "could be constructed and in commercial operation by the 2029/30 Delivery Year or sooner.").

[20] *Id.* at 12.

[21] *Id.* at 7.

[22] *2024 Long-Term Reliability Assessment*, North American Electric Reliability Corporation at 92 (Dec. 2024), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_Long%20Term%20Reliability%20 Assessment_2024.pdf at 92.

[23] *Id.* at 4.

[24] *Id.* at 7.

[25] *Id.* at 91-92.

[26] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (Strengthening the Reliability and Security of the United States Electric Grid), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-the-reliabilityand-security-of-the-united-states-electric-grid/.

[27] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[28]

The Department of Energy's (Department) July 2025 Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid, issued pursuant to the President's directive in Executive Order 14262, details the myriad challenges affecting the Nation's energy outlook. It concludes, "Absent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[29] The prolific growth of data centers for the development of AI, as well as their immense energy needs, presents a new and unexpected source of load growth. For example, PPL Electric Utilities has 11.7 GW of advanced data center requests in Pennsylvania through to 2030.[30] As of December 2024, Dominion Energy has 40.2 GW of contracted data center capacity, which is an 18.2 GW increase over the amount from July 2024, an approximately 88% increase.[31] Regarding the PJM region, the Department's analysis performed this year in collaboration with the national labs modeled the effects of approximately 25 GW of load growth in PJM, of which 15 GW came from data centers, as well as approximately 17 GW of announced coal, gas, and oil generation retirements.[32] Under these assumptions, the model estimated approximately 430.3 loss of load hours in an average weather year. Under worst weather year assumptions, the model estimated 1,052 loss of load hours and a max unserved load hours of approximately 21.335 GW.[33]

Grid operators, including PJM, have likewise acknowledged the Nation's current energy crisis. For instance, during a March 25, 2025, hearing before the United States House of Representatives Committee on Energy and Commerce, Manu Asthana, President and CEO, PJM, testified that there was a "growing resource adequacy concern . . . impacting a significant part of our country."[34] Mr. Asthana explained that the "rate of electricity demand is anticipated to increase significantly in the future due to development of large data centers in the PJM service Area . . . [and] increases in demand coming from the transportation and heating sectors and from industrial growth."[35] Mr. Asthana noted that, "though various reforms instituted by PJM had succeeded in bringing new generation online and preventing the retirement of existing units, supply conditions within PJM are still tightening." Therefore, Mr. Asthana stated that PJM

---

[28] *Id.*

[29] *See also* Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid, U.S. Department of Energy (July 2025), at 1, https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[30] *See PPL Corporation Q2 2025 Investor Update,* PPLC Corporation (July 31, 2025) at 7, https://filecache.investorroom.com/mr5ir_pplweb2/1245/PPL_2025_Q2_Investor_Update_vFINAL.pdf

[31] *See* Dominion Energy Virginia, Q4 2024 Earnings Call (Feb. 12, 2025), at 18, https://s2.q4cdn.com/510812146/files/doc_financials/2024/q4/2025-02-12-DE-IR-4Q-2024-earnings-call-slides-vTCII.pdf.

[32] *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, U.S. Department of Energy (July 2025), at 28, https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[33] *Id.* at 27.

[34] Asthana Test. at 4.

[35] *Id.*

"encourage[s] all generation owners who have signaled an intent to retire their units to reconsider their decision to support resource adequacy and grid reliability."[36]

## ORDER

FPA section 202(c)(1) provides that whenever the Secretary of the Department of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[37] This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of the Eddystone Units when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

Such is the case here. As described above, the emergency conditions resulting from increasing demand and accelerated retirements of generation facilities supporting the issuance of Order No. 202-25-4 will continue in the near term and are also likely to continue in subsequent years. This could lead to the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages, presenting a risk to public health and safety. Given the responsibility of PJM to identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, continued additional dispatch of the Eddystone Units is necessary to best meet the emergency and serve the public interest under FPA section 202(c).

To ensure the Eddystone Units will be available if needed to address emergency conditions, the Eddystone Units shall remain in operation until November 26, 2025.[38]

Based on my determination of an emergency set forth above, I hereby order:

A. From 5:03PM EDT on August 28, 2025, PJM and Constellation Energy shall take all measures necessary to ensure that the Eddystone Units are available to operate. For the duration of this Order, PJM is directed to take every step to employ economic dispatch of the Eddystone Units to minimize cost to ratepayers. Constellation Energy is directed to comply with all orders from PJM related to the availability and dispatch of the Eddystone Units.

B. To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters as determined by PJM pursuant to paragraph A. PJM shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Eddystone Units has operated in

---

[36] *Id*. at 10.
[37] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b) (2018).
[38] 16 U.S.C. § 824a(c)(4).

compliance with the allowances contained in this Order.

C. All operation of the Eddystone Units must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D. By September 12, 2025, PJM is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with this Order. PJM shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E. Constellation Energy is directed to file with the Federal Energy Regulatory Commission Tariff revisions or waivers to effectuate this Order. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. This Order shall not preclude the need for the Eddystone Units to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, the Eddystone Units shall not be considered capacity resources.

H. This Order shall be effective from 5:03 PM Eastern Daylight Time (EDT) on August 28, 2025, and shall expire at 00:00 EST on November 26, 2025, with the exception of applicable compliance obligations in paragraph D.

I. Issued in Washington, D.C., at 7:11 PM Eastern Daylight Time on this 27th day of August 2025.


Chris Wright
Secretary of Energy

cc:     **<u>FERC Commissioners</u>**
        Chairman David Rosner
        Commissioner Lindsay S. See
        Commissioner Judy W. Chang

        **<u>Pennsylvania Public Utility Commissioners</u>**
        Chairman Stephen M. DeFrank
        Vice Chair Kimberly M. Barrow
        Commissioner Kathryn L. Zerfuss
        Commissioner John F. Coleman, Jr.
        Commissioner Ralph V. Yanora

Exhibit B

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

|  |  |  |
|---|---|---|
| Federal Power Act Section 202(c) | ) | Order No. 202-25-8 |
| Emergency Order: PJM Interconnection | ) | |
| And Constellation Energy | ) | |

Motion to Intervene and Request for Rehearing of
Natural Resources Defense Council, Citizens for Pennsylvania's Future,
Environmental Defense Fund, Sierra Club and Public Citizen

I.     INTRODUCTION ........................................................................... 4

II.    STATEMENT OF ISSUES AND SPECIFICATION OF ERROR .............. 7

III.   INTERVENORS' INTERESTS ...................................................... 10

    A.   NATURAL RESOURCES DEFENSE COUNCIL .............................. 11

    B.   CITIZENS FOR PENNSYLVANIA'S FUTURE ................................ 12

    C.   ENVIRONMENTAL DEFENSE FUND ............................................ 13

    D.   SIERRA CLUB .......................................................................... 13

    E.   PUBLIC CITIZEN ...................................................................... 14

IV.    BACKGROUND ......................................................................... 14

    A.   EDDYSTONE AND THE INITIAL ORDER ...................................... 14

    B.   EDDYSTONE OPERATION AND COST RECOVERY ....................... 18

    C.   THE DEPARTMENT'S RESOURCE ADEQUACY REPORT ............... 21

    D.   THE RENEWED ORDER ........................................................... 23

V.     REQUEST FOR REHEARING ..................................................... 24

    A.   THE RENEWED ORDER IS CONTRARY TO LAW .......................... 25

        *1. Section 202's Text and Structure Establish that Emergency Authority
        Can Only Be Invoked to Address Imminent, Certain Supply
        Shortfalls Requiring Immediate Response.* ...................................... 25

        *2. Congress' Enactment of a Specific, Cabined Scheme to Address
        Reliability Concerns Confirms that Section 202(c) Cannot be
        Expanded to Impose Requirements Related to Long-Term Reliability.*
        .................................................................................................... 29

        *3. Regulations Similarly Establish that Section 202(c) Emergency
        Authority Can Only Be Invoked to Address Imminent, Certain
        Supply Shortfalls Requiring Immediate Response.* .......................... 32

*4. Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises*................................................................. 35

*5. The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Long-Term Resource Adequacy.* 37

B. THERE IS NO FACTUAL BASIS SUPPORTING THE DEPARTMENT'S ORDER.. 39

*1. Neither the Energy Emergency Nor the Grid Reliability Executive Order Evince an Emergency Redressable By Section 202(c).* ........... 40

*2. There is No Near-Term Emergency* ................................................... 44

a. Eddystone's operations in June and July 2025 do not indicate an ongoing emergency .......................................................................... 44

b. Past PJM Hot Weather and Maximum Generation Alerts do not indicate an ongoing emergency .......................................................... 51

c. DOE fails to substantiate its assertion that any tight grid conditions will persist this fall. .................................................................. 55

*3. PJM Has Sufficient Capacity Resources Without Eddystone* ........... 57

a. DOE rehashes evidence from its initial order that does not establish an emergency ........................................................................... 57

    i.    PJM 2023 Report ...................................................................... 60

    ii.   March 2025 Asthana Testimony ................................................ 63

    iii.  Resource Reliability Initiative .................................................... 64

    iv.  NERC 2024 LTRA ....................................................................... 65

b. Possible data center load growth in the next five years does not constitute a near-term emergency .................................................... 67

C. THE RENEWED ORDER WILL UNDERMINE COMPETITIVE MARKETS TO THE DETRIMENT OF CONSUMERS AND RELIABILITY ......................................... 72

*1. Competitive Markets Have a Long History of Success.* ..................... 72

*2. Command and Control Orders Run Counter to Federal Power Act Requirements and Fundamental Market Principles.* ........................ 76

D. THE TERMS OF THE RENEWED ORDER DO NOT BEST MEET THE CLAIMED EMERGENCY OR SERVE THE PUBLIC INTEREST ......................................... 80

*1. Section 202(c)(1) Only Authorizes the Department to Require Generation that Best Meets the Emergency and Serves the Public Interest.* .............................................................................................. 80

*2. The Renewed Order Does Not Contain a Reasoned Basis that Eddystone Best Meets the Claimed Emergency and Serves the Public Interest.* .............................................................................................. 84

E.   THE TERMS OF THE RENEWED ORDER EXCEED OTHER LIMITS ON THE
     DEPARTMENT'S STATUTORY JURISDICTION ............................................... 87

     1.  *The Department Lacks Jurisdiction to Impose Availability
         Requirements.* ...................................................................... 87

     2.  *The Department Lacks Jurisdiction to Disallow Treatment of
         Eddystone as a Capacity Resource.* ...................................... 91

F.   THE RENEWED ORDER FAILS TO PROVIDE THE CONDITIONS NECESSARY TO
     OVERRIDE ENVIRONMENTAL STANDARDS UNDER SECTION 202(C)(2). ..... 96

     1.  *The Renewed Order May Result in a Conflict with Federal, State, or
         Local Environmental Law or Regulation.* ........................................ 97

     2.  *The Renewed Order Lacks the Conditions Required by Section 202(c)*
         .................................................................................................. 99

     a. The Terms of the Renewed Order Fail to Require Generation Only
        During Hours Necessary to Meet the Purported Emergency ........... 99

     b. The Renewed Order Fails to Ensure Maximum Practical Compliance
        with Environmental Rules and Minimize Adverse Environmental
        Impacts ............................................................................................. 100

     c. The Department Has Not Demonstrated That It Conducted the
        Required Consultation or Adopted Conditions Thereafter ............. 102

VI.  **REQUEST FOR STAY** ................................................................... **104**

     A.   INTERVENORS ARE IRREPARABLY HARMED BY THE ORDER. ................... 105

     B.   A STAY WOULD NOT RESULT IN HARM TO ANY OTHER INTERESTED
          PARTIES. ................................................................................. 107

     C.   A STAY IS IN THE PUBLIC INTEREST. ...................................... 107

VII. **CONCLUSION** ............................................................................ **108**

# I.    INTRODUCTION

Pursuant to section 313 of the Federal Power Act ("the Act"), 16 U.S.C.

§ 825*l*, Natural Resources Defense Council, Citizens for Pennsylvania's Future,

Environmental Defense Fund, Sierra Club, and Public Citizen (together "Public

Interest Organizations") request that the Department of Energy ("Department" or

"DOE") grant rehearing of Order No. 202-25-8 (August 27, 2025) (the "Renewed

Order"), which renews Order No. 202-25-4 (May 30, 2025) (the "Initial Order").[1]

Acting on its own motion and without providing notice, the Department issued the

Renewed Order on August 27, 2025, pursuant to its emergency authority under

section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c) ("Section 202(c)"), to

instruct PJM Interconnection, LLC ("PJM") and Constellation Energy Corporation

("Constellation") to continue to "take all measures necessary to ensure that" Units 3

and 4 of the Eddystone Generating Station, in Eddystone, Pennsylvania,

("Eddystone" or the "Eddystone Units"), remain "available to operate" until

November 26, 2025, and further directed PJM to "take every step to employ

economic dispatch" during that time period.  Ex. 1 at 6.  Prior to the Department's

Initial Order, Constellation was preparing to retire these two aging oil- and gas-

burning units on May 31, 2025, with PJM's approval.

The Department should grant rehearing and rescind this costly, harmful,

unnecessary, and unlawful Renewed Order.  The PJM region had no energy

---

[1] A copy of the Renewed Order is attached as Ex. 1, and a copy of the Initial Order is attached as Ex. 2.

emergency, as defined by Section 202(c), when the Initial Order was issued and there is no energy emergency now. By its own terms, the Renewed Order aims to address "potential longer term resource adequacy" issues that may or may not come to pass and are already being addressed by the long-standing processes and procedures under PJM's tariff to ensure long-term resource adequacy and reliability. The Federal Power Act provides lawful means for states, grid operators, the Federal Energy Regulatory Commission ("FERC"), and the North American Electric Reliability Corporation ("NERC") to plan for ongoing system reliability, but command and control operation of the energy system by DOE and the President under the guise of a Section 202(c) emergency is not one of them.

The Eddystone Units were scheduled to deactivate only following analysis showing that their retirement would not cause any transmission instability and that replacement economic capacity resources were available. The Department's overreach represents an unprecedented interference with regulation of grid resource adequacy, an area Congress reserved for other authorities, 16 U.S.C. § 824(b)(1), imposes unnecessary costs imposed on already-overburdened ratepayers, and causes needless pollution emitted into Pennsylvania and neighboring states.

Like the Initial Order, the Renewed Order's emergency declaration fails to identify any error or insufficiency in the PJM resource adequacy plans that took account of retirement of the Eddystone Units, or to show that there would have been any true "emergency" had the Eddystone Units retired in May 2025, as planned and approved. Similarly, the Department's invocation of Executive Order

14,156 (*Declaring a National Energy Emergency* ("Energy Emergency EO")) and Executive Order 14,262 (*Strengthening the Reliability and Security of the United States Electric Grid* ("Grid EO")) fail to supply any support for the Renewed Order. Neither executive order overrides the statutory limitations of the Department of Energy's authority under Section 202(c), and neither provides the specific information needed to support issuance of this Renewed Order or any other Section 202(c) order.[2]

Nor does the Department's July 7, 2025, Resource Adequacy Report, issued in response to the Grid EO, provide support for the Renewed Order. As detailed in the Public Interest Organizations' Request for Rehearing regarding the Resource Adequacy Report, that report is devoid of evidence of conditions that would constitute an "emergency" within the meaning of Section 202(c) in the PJM region or elsewhere and, indeed, frankly acknowledges that the report is unsuitable to guide reliability interventions.[3]

Even assuming there is an emergency under Section 202(c), the Renewed Order fails to demonstrate that continued operation of the Eddystone Units is the action that "best meet[s] the emergency and serve[s] the public interest." 16 U.S.C.

---

[2] As the Department's own regulations emphasize, an "emergency," arises when there is an "*unexpected* inadequate supply of electric energy which may result from the *unexpected* outage or breakdown of facilities," due to weather, acts of God, "sudden" increases in demand, inability to obtain fuel, or a regulatory action prohibiting the use of certain facilities. 10 C.F.R. § 205.371 (emphasis added). The Department makes no pretense of identifying these conditions as the bases for the Order.

[3] July 7, 2025, "Resource Adequacy Report: Evaluating the Reliability and Security of the United States," at i (hereinafter, the "RAR") (attached as Ex. 3).

§ 824a(c).  The Renewed Order completely fails to address alternatives to continued operation of the Eddystone Units, including the alternatives Public Interest Organizations identified for the Department in response to the Initial Order.  Nor does the Renewed Order provide sufficiently clear instructions for Constellation and PJM, both as to plant operations and economic dispatch.  And compounding these failures, the Renewed Order includes no specific provisions to limit the environmental and public health harms that Eddystone imposes on the surrounding communities, despite explicit instruction from Congress to do so.

In short, the Renewed Order, like the Initial Order, is an unlawful abuse of the Department's emergency authority and should be rescinded.  The Department has no authority to control long term grid planning and cannot get around that limitation through the guise of a manufactured "emergency" and serial 90-day orders that amount to a permanent edict.  The statutory bases for issuing an order under Section 202(c) are not present; and even if they were, the Renewed Order would still be unlawful because it fails to comply with the substantive requirements of Section 202(c), resulting in a twofold blow to PJM ratepayers: higher rates and more pollution with no net benefit received.  The Department is authorized only to use Section 202(c) for real emergencies, not to usurp authority for grid reliability planning and to prop up fossil fuel businesses.

## II.    STATEMENT OF ISSUES AND SPECIFICATION OF ERROR

The undersigned Public Interest Organizations move to intervene and request rehearing and a stay pursuant to section 313(a) of the Federal Power Act,

16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure,[4] based upon the following errors and issues:

- The Renewed Order exceeds the Department's authority because it has not, and cannot, demonstrate an unexpected emergency under Section 202(c) necessitating continued operation of Eddystone. 16 U.S.C. § 824a(c); H.R. Rep. No. 114-357 § 61002 (2015); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610 (D.C. Cir. 1978); S. Rep. No. 74-621 (1935); 16 U.S.C. § 824a(a) & (b); *Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232 (8th Cir. 1970); 16 U.S.C. § 824o; 70 Fed. Reg. 53,117; S. Rep. No. 109-78 (2005); *Alcoa, Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009); 16 U.S.C. § 824o(c)-(d); 16 U.S.C. § 824o(a)(3); 16 U.S.C. § 824o(d)(2)-(4); 16 U.S.C. § 824o(e); 16 U.S.C. § 824o(i)-(j); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); 10 C.F.R. § 205.371; 10 C.F.R. § 205.375; 46 Fed. Reg. 39,984; *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349 (1941); Department of Energy Order No. 202-22-4 (Dec. 24, 2022); Department of Energy Order 202-20-2 (Sept. 6, 2020).

- There is no factual basis supporting the Renewed Order. 16 U.S.C. § 824a(c); 16 U.S.C. § 824a(c); 16 U.S.C. § 824o-1; 16 U.S.C. § 809; 10 C.F.R. 205.371; 10 C.F.R. § 205.375; 190 FERC ¶ 61,084; 190 FERC 61,083; S. Rep. No. 94-1168, 3 (1976); Executive Order 14,156, Declaring a National Energy Emergency, 90 Fed. Reg. 8,433 (Jan, 20, 2025); Executive Order 14,262, Strengthening the Reliability and Security of the United States Electric Grid, 90 Fed. Reg. 15,521 (Apr. 14, 2025); *Biden v. Nebraska*, 600 U.S. 477, 500-01 (2023); *Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610 (D.C. Cir. 1978).

- The Renewed Order will undermine competitive markets to the detriment of consumers and reliability. Executive Order 14,156, Declaring a National

---

[4] U.S. Dep't of Energy, DOE 202(c) Order Rehearing Procedures, https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (last visited June 18, 2025) (attached as Ex. 4). This website was altered after June 18, 2025, and the procedures were removed. *Compare* https://web.archive.org/web/20250604093213/https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures with the current website. *See also* Email from Lot Cooke, U.S. Dep't of Energy to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 (December 28, 2005) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's] Rules of Practice and Procedure, 18 CFR Part 385.") (attached as Ex. 5).

Energy Emergency, 90 Fed. Reg. 8,433 (Jan, 20, 2025); 16 U.S.C. § 824a(c); 16 U.S.C. § 824d; Order Terminating Rulemaking Proceeding, Initiating New Proceeding, And Establishing Additional Procedures, 162 FERC ¶ 61,012 (2018); Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996); Order No. 888-A, FERC Stats. & Regs. ¶ 31,048; Order No. 888-B, 81 FERC ¶ 61,248 (1997); Order No. 888-C, 82 FERC ¶ 61,046 (1998); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000); *New York v. FERC*, 535 U.S. 1 (2002); Order No. 890, FERC Stats. & Regs. ¶ 31,241 (1997); Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999); Order 787, 145 FERC ¶ 61,134 (2013); Order 809, 151 FERC ¶ 61,049 (2015); Centralized Capacity Markets in Regional Transmission Organizations and Independent System Operators, 149 FERC ¶ 61,145 (2014); Order Approving Extreme Cold Weather Reliability Standards EOP-011-3 and EOP-012-1 and Directing Modification of Reliability Standard EOP-012-1, 182 FERC ¶ 61094 (2023); Order Approving Extreme Cold Weather Reliability Standard EOP-012-2 and Directing Modification, 187 FERC ¶ 61,204 (2024); Order Accepting Tariff Revisions Subject to Condition, 186 FERC ¶ 61,080 (2024); Department of Energy Order No. 202-25-3 (May 23, 2025); Department of Energy Order No. 202-25-7 (Aug. 20, 2025); Department of Energy Order No. 202-25-3B (Sept. 8, 2025).

- Even if there were a short-term need—there is not—the Renewed Order does not comply with the statutory command to set terms that best meet the emergency and serve the public interest. 16 U.S.C. § 824a(c)(1); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976 (D.C. Cir. 2004); *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005); 10 C.F.R. § 205.370; 16 U.S.C. § 824a(c); 10 C.F.R. § 205.373; *Wabash Valley Power Ass'n*, 268 F.3d 1105 (D.C. Cir. 2001); *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86 (1962); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414 (1952); 46 Fed. Reg. 39,985; Department of Energy Order No. 202-22-4 (Dec. 24, 2022).

- The terms of the Renewed Order exceed other limits on the Department's statutory jurisdiction. 16 U.S.C. §§ 824(b)(1), 824a(c)(1); 16 U.S.C. § 824d(d); 18 C.F.R. § 35.1(e); S. Rep. No. 74-621; S. 1725, Cong. Tit. II § 203(a); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009); *New York v. FERC*, 535 U.S. 1 (2002); *Conn. Light & Power v. Fed. Power Comm'n*, 324

U.S. 515, 529 (1945); *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972); *Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008). *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973).

- The Renewed Order fails to provide the conditions necessary to override environmental standards under Section 202(c)(2). 16 U.S.C § 824a(c)(2); *City of New Orleans v. FERC*, 67 F.3d 947 (D.C. Cir. 1995); *Fla. Power & Light Co. v. FERC*, 88 F.3d 1239 (D.C. Cir. 1996); 68 Fed. Reg. 1660; Department of Energy Order No. 202-22-4 (Dec. 24, 2022); Department of Energy Order No. 202-17-4 (Sept. 15, 2017); Department of Energy Order No. 202-24-1 (Oct. 9, 2024); Department of Energy Order No. 202-22-2 Amendment No. 1 (Sept. 4, 2022); Department of Energy Order No. 202-22-1 Amendment No. 2 (Sept. 2, 2022)

- The Renewed Order and the Department's continued conduct are inconsistent with departmental procedure, depriving the public and the Public Interest Organizations of fair Notice and an adequate record. *Morton v. Ruiz*, 415 U.S. 199 (1974); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519 (D.C. Cir. 1994); *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240 (2d Cir. 1977).

## III.   INTERVENORS' INTERESTS

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of this proceeding.  Each party may therefore intervene in this proceeding.  Ex. 4; *see also* 18 C.F.R. § 385.214.

Each of the Public Interest Organizations also demonstrates a concrete injury arising from the Renewed Order that is redressable by a favorable outcome.  Each organization is therefore aggrieved by the Renewed Order and may properly apply for rehearing.  *See* 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112-13 (D.C. Cir. 2001); *NextEra Energy Res. v. ISO New Eng., Inc.*, 157 FERC ¶ 61,059, at P 5 (2016).

## A. Natural Resources Defense Council

Natural Resources Defense Council ("NRDC") is a national non-profit membership organization whose mission includes ensuring the rights of all people to clean air, clean water, and healthy communities. NRDC has a longstanding organizational commitment to protect the interests of its members and to reduce pollution caused by fossil fuel fired power plants such as Eddystone. NRDC works to achieve clean energy solutions that will lower consumer energy bills, meet greenhouse gas emission reduction goals, accelerate the use of energy efficiency and renewable energy, and ensure that clean energy is affordable and accessible to all.

NRDC and its members are aggrieved by the Renewed Order. Over 19,800 NRDC members reside in Pennsylvania, over 1,500 NRDC members reside in Delaware, over 9,600 NRDC members reside in Maryland, and approximately 12,600 NRDC members reside in New Jersey. Of these, approximately 1,300 members reside within ten miles of the Eddystone Units. These NRDC members are harmed by DOE's order to operate the Eddystone Units beyond their planned retirement date because their continued operation will subject NRDC members to air and water pollution in the areas where they live, work, and recreate. NRDC members are also exposed to the noise and visual impacts of the plant's operation. The impact of the Renewed Order on the health, aesthetic, and recreational interests of NRDC members is compounded by the Renewed Order's failure to address the Federal Power Act's requirements for environmental protection that apply even in true emergencies (discussed in section V.F. below). In addition, NRDC members are ratepayers in the PJM region who will be subject to higher

electric bills as a result of the Renewed Order. NRDC also operates offices in Washington D.C. and Chicago, which are both in the PJM region. NRDC pays for the electricity used by its Washington D.C. and Chicago offices and will be subject to higher electric bills as a result of the Order. Moreover, NRDC has a sustainable operations plan with a goal of reducing net creation of greenhouse gas emissions derived from building operational activity to zero. NRDC and its members therefore have a strong interest in promoting actions that displace less cost-effective fossil generation with more cost-effective clean energy.

## B. Citizens for Pennsylvania's Future

Citizens for Pennsylvania's Future ("PennFuture") is a Pennsylvania-based statewide environmental organization dedicated to leading the transition to a clean energy economy in Pennsylvania and beyond. PennFuture has approximately 1,000 members across the state. PennFuture's mission is to protect our air, water, and land, and to empower citizens to build sustainable communities for future generations. One focus of PennFuture's work is to address the climate-warming pollution from Pennsylvania's power fleet. PennFuture also works to advance understanding and recognition of Pennsylvania's Environmental Rights Amendment, contained in Article 1, Section 27 of Pennsylvania's Constitution and to ensure that Commonwealth entities meet their obligations under the Amendment as trustees of Pennsylvania's public natural resources. To promote affordable and clean energy, PennFuture advocates before government entities, including local, state, and federal agencies such as FERC, on issues related to electricity markets, policies affecting the clean energy transition, and just and

reasonable rates. This proceeding raises issues which are important to the environmental, public health, and affordability interests that PennFuture seeks to advance.

### C. Environmental Defense Fund

The Environmental Defense Fund ("EDF") is a nonprofit membership organization with hundreds of thousands of members nationwide, including more than thirteen thousand members in Pennsylvania, whose mission is to build a vital Earth for everyone by preserving the natural systems on which all life depends. Guided by expertise in science, economics, law, and business partnerships, EDF seeks practical and lasting solutions to address environmental problems and protect human health, including in particular by addressing pollution from the power sector. On behalf of its members, EDF works with partners across the private and public sectors to engage in utility regulatory forums at the federal level and throughout the United States to advocate for policies that will create an affordable, reliable, and low pollution energy system. The Renewed Order harms EDF members because it will result in increased pollution that will impact the health of people and nature and because it will increase energy costs for EDF members throughout the PJM region.

### D. Sierra Club

Sierra Club and its members are aggrieved by the Order. Over 55,000 Sierra Club members reside in Pennsylvania and New Jersey; and over 4,000 of those members reside in one of the four counties most likely to be impacted by pollution from Eddystone. Sierra Club members are harmed by pollution produced by

operating the Eddystone Units.  The Renewed Order to operate the plant beyond its
planned retirement date will subject Sierra Club members to additional air
pollution in the areas where they live and recreate.  The Renewed Order's impact on
the health, aesthetic, and recreational interests of Sierra Club members is
heightened by the Order's failure to address the Federal Power Act's requirements
for environmental protection that apply even in true emergencies.  In addition,
Sierra Club operates multiple offices in the PJM region, and has well over 100,000
members living in the PJM region, all of whom will be subject to higher electric bills
as a result of the Department's Renewed Order.

### E. Public Citizen

Established in 1971, Public Citizen is a national, not-for-profit, non-partisan,
research and advocacy organization representing the interests of household
consumers.  Public Citizen has over 500,000 members and supporters across the
United States, including in PJM and Pennsylvania.  Public Citizen is active before
FERC promoting just and reasonable rates, and supporting efforts for utilities to be
accountable to the public interest.  Public Citizen's interests in this proceeding are
unique, and cannot be represented by any other party.

## IV.    BACKGROUND

### A. Eddystone and the Initial Order

The history of the Eddystone Generating Station and the Initial Order is
described in detail in the Public Interest Organization's Request for Rehearing on

the Initial Order ("Initial RFR").[5]  In summary, Eddystone, which is owned and

operated by Constellation, is a six-unit power plant located along the banks of the

Delaware River in Eddystone, Pennsylvania, just south of Philadelphia and in the

PJM regional transmission organization ("RTO").[6]  Units 3 and 4 are both steam

boiler-turbine generator units that can run on either natural gas or distillate fuel

oil.  These units are "peakers," i.e., units that run only during periods of high

demand due to their high operating costs.[7]  Sub-critical steam boiler-turbine units,

such as Eddystone 3 and 4,[8] typically have long start up times exceeding 12 hours.[9]

On December 1, 2023, Constellation notified PJM of its intent to deactivate

---

[5] *See* Motion to Intervene and Request for Rehearing of Natural Resources Defense Council, Citizens for Pennsylvania's Future, Environmental Defense Fund, Sierra Club, and Public Citizen regarding Order No. 202-25-4, attached as Ex. 8.

[6] Constellation, Eddystone Generating Station, https://www.constellationenergy.com/our-company/locations/location-sites/eddystone-generating-station.html (last visited June 20, 2025).

[7] U.S. Energy Information Administration, Electric generator dispatch depends on system demand and the relative cost of operation (Aug. 17, 2012), https://www.eia.gov/todayinenergy/detail.php?id=7590 ("Peaking generators typically have the highest variable operating costs, appearing on the far right of the supply curve, and are dispatched during the hours when demand for electricity is highest. Peaking unit technology includes diesel generators and, most commonly, combustion turbines (CTs) fueled by natural gas.  Combustion turbines have been used for many years, and older units are inefficient.").

[8] Paul Gerke, Feds order Pennsylvania fossil-fuel plant to stay open another 90 days, Power Engineering (Aug. 28, 2025) https://www.power-eng.com/gas/feds-order-pennsylvania-fossil-fuel-plant-to-stay-open-another-90-days/.

[9] *See* U.S. Energy Information Administration, About 25% of U.S. power plants can start up within an hour (Nov. 19, 2020) https://www.eia.gov/todayinenergy/detail.php?id=45956 (showing that 60% of gas-power steam turbine units have start up times greater than 12 hours).

Eddystone Units 3 and 4 effective May 31, 2025.[10]  In that letter, Constellation explained that it was "retiring Eddystone Units 3 and 4 because continued operation of these units is expected to be uneconomic."[11]  At the time Constellation submitted this notification, prices for capacity (a key revenue stream for peaking units) were low—only $28.92 per megawatt-day.[12]  In July 2024, prices for capacity rose to $269.92 per megawatt-day.[13]  Nevertheless, Constellation did not withdraw its deactivation notice, despite its planned deactivation still being nearly a year in the future.

The Eddystone Units are located just outside of Chester, Pennsylvania, a community that faces one of the nation's worst cases of environmental racism.[14]  Whenever it is operating, Eddystone contributes to the pollution impacting this community.  On a yearly basis, Eddystone emits thousands of tons of criteria air

---

[10] Letter from Bryan Hanson, Constellation, to Michael Bryson, PJM (Dec. 1, 2023), https://www.pjm.com/-/media/DotCom/planning/gen-retire/deactivation-notices/eddystone-deactivation-letter.pdf.

[11] *Id.*

[12] PJM, 2025/2026 Base Residual Auction Report (Jul. 30, 2024), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2025-2026/2025-2026-base-residual-auction-report.pdf, at Table 1.

[13] *Id.*

[14] *See* Chester Residents Concerned for Quality Living, https://chesterpaej.org/ (last visited June 26, 2025); University of Pennsylvania, Perelman School of Medicine, Center of Excellence in Environmental Toxicology, *Chester*, http://ceet.upenn.edu/community/target-communities/chester/ (last visited June 26, 2025).

pollutants, *see* Table 2, and large amounts of water pollutants.[15]  And when

Eddystone operates on oil rather than natural gas, it emits higher levels of both

criteria pollutants and hazardous air pollutants.[16]  These air pollutants are linked

to respiratory symptoms like asthma,[17] cancer, reproductive difficulties, and other

health problems.[18]

| Table 2 | | | | | | |
|---|---|---|---|---|---|---|
| Annual Emissions | 2020 | 2021 | 2022 | 2023 | 2024 | Cumulative Emissions |
| CO2 (tons) | 11,167 | 14,943 | 18,636 | 28,332 | 58,566 | **131,644** |
| NOx (lbs) | 11,918 | 15,488 | 20,506 | 29,606 | 59,232 | **136,750** |
| SO2 (lbs) | 128 | 176 | 234 | 322 | 704 | **1,564** |
| Source: EPA, *Annual Emissions Data for Eddystone Generating Station*, 2020–2024, available at CAMPD, https://campd.epa.gov/ (accessed June 20, 2025). | | | | | | |

On May 30, 2025, the Department issued the Initial Order based on its

"determin[ation] that an emergency exists in portions of the electricity grid operated

by PJM due to a shortage of facilities for the generation of electric energy, resource

---

[15] EPA, Pollutant Loading Report, https://echo.epa.gov/trends/loading-tool/reports/dmr-pollutant-loading?permit_id=PA0013714&year=2024 (last visited June 26, 2025) (including over 2 million pounds of total suspended solids, and over 25,000 pounds of ammonia, as well as 1,617 pounds of copper and 564 pounds of lead, in 2024 alone).

[16] Ex. 6 (Eddystone Title V Permit) at 28, 50 (noting sulfur content of oil and higher NOx emissions from oil-fired generation); 68 Fed. Reg. 1660,1678 (Jan. 13, 2003) (noting that switching from oil to natural gas "would reduce mercury, metallic [toxics], and inorganic" hazardous air pollutant emissions).

[17] EPA, Effects of NO2, Health Effects, https://www.epa.gov/no2-pollution/basic-information-about-no2#:~:text=Health%20effects,more%20about%20Visibility%20and%20Haze; https://www.epa.gov/so2-pollution/sulfur-dioxide-basics (last visited June 26, 2025).

[18] EPA, Health and Environmental Effects of Hazardous Air Pollutants, https://www.epa.gov/haps/health-and-environmental-effects-hazardous-air-pollutants (last visited June 26, 2025).

adequacy concerns, and other causes." Ex. 2 at 1. Based on this determination, the Department ordered Constellation to take all measures necessary to ensure that the Eddystone Units are available to operate and ordered PJM to take steps to employ economic dispatch for the Units. *Id.*

The Initial Order also required PJM, by June 15, 2025, to provide the Department "with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with the public interest," as well as "additional information" regarding "environmental impacts" and "compliance" with the Initial Order. *Id.* Neither the Department nor PJM has made these filings public.

## B. Eddystone Operation and Cost Recovery

The Initial Order directed PJM "to take every step to employ economic dispatch of the units to minimize cost to ratepayers." Ex. 2 at 3. In a letter submitted to the Department on June 13, 2025, PJM indicated that the units would run as directed by PJM for reliability purposes, which PJM defined to include: (1) supporting the PJM system operation within established thermal, voltage, and stability limits, when these needs "cannot otherwise be met with available economically dispatched generating resources;" (2) system restoration needs; and (3) "a Capacity Emergency, . . . during which PJM determines that the resources

scheduled for an operating day are not sufficient to maintain the appropriate reserve levels for PJM."[19]

PJM has not provided complete information to its members or the public about the extent of Eddystone's operation pursuant to the Initial Order.  PJM has published its letters to DOE indicating the days on which one or both Eddystone units have operated. However, the information in these letters is limited to the number of hours that the units may have run, and any operational issues encountered; the letters do not state the level at which the units have run, the particular reasons for them running, or the type of fuel burned.[20]

---

[19] PJM, Eddystone 3 and 4 Unit Reporting and Commitment Process (June 12, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/committees/oc/postings/20250612-eddystone-3-and-4-unit-reporting-and-commitment-process.pdf.

[20] PJM, Compliance Report June 24, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250624-doe-compliance-report-for-eddystone-units-3-and-4.pdf; PJM, Compliance Report June 25, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250625-pjm-report-in-compliance-w-ordering-paragraph-b-of-the-doe-20250530-order-no-202-25-4.pdf; PJM, Compliance Report re: Eddystone Units 3 and 4 Submitted June 26, 2025 for operations on June 25, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250626-pjm-report-in-compliance-with-ordering-para-b-of-the-doe20250530-order-no-202-25-4.pdf; PJM, Compliance Report re: Eddystone Units 3 and 4 Submitted June 27, 2025 for operations on June 26, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250627-pjm-report-in-compliance-with-ordering-para-b-of-the-doe-20250530-order-no-202-25-4.pdf; PJM, Compliance Report re: Eddystone Units 3 and 4 Submitted July 29, 2025 for operations on July 28, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250729-pjm-report-in-compliance-with-ordering-para-b-of-doe-20250530-order-no-202-25-4.pdf; PJM, Compliance Report re: Eddystone Units 3 and 4 Submitted July 30, 2025 for operations on July 29, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250730-pjm-report-in-compliance-with-ordering-para-b-of-doe-20250530-order-no-202-25-4.pdf; PJM, Compliance

The Renewed Order summarizes U.S. EPA data indicating that the Eddystone units "generated over 17,000 MWhs during the month of June." Ex. 1 at 2. The Renewed Order also notes that "[d]uring a hot weather period from July 28 to July 30, Unit 3 ran for 39 hours and Unit 4 ran 8 hours." *Id.* (citing PJM daily reports to DOE under Order No. 202-25-4, July 29-31, 2025). PJM has not disclosed which reliability purpose under the Operations Methodology necessitated operation of the Eddystone Units during these days, nor whether such operation reflected economic dispatch.

In the Initial Order, DOE referred rate issues to FERC and required that PJM "file with [FERC] any tariff revisions or waivers necessary to effectuate this order," with "[r]ate recovery . . . available pursuant to [Section 202(c)]." Ex. 2 at 3; *see also* U.S. Dep't of Energy, Referral to the Federal Energy Regulatory Commission, Docket No. AD25-15-000 (filed June 17, 2025). On June 26, 2025, PJM filed a Section 205 proceeding (16 U.S.C. § 824d) at FERC seeking approval of tariff provisions to recover the costs of running the Eddystone Units pursuant to the Initial Order. PJM proposed to "allocate the cost associated with such credit to Load Serving Entities using a methodology consistent with the present allocation of costs associated with the recovery of region-wide capacity costs," namely that "[e]ach Load Serving Entity will be assessed a section 202(c) charge based on the

---

Report re: Eddystone Units 3 and 4 Submitted July 31, 2025 for operations on July 30, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250731-pjm-report-in-compliance-with-ordering-para-b-of-doe-20250530-order-no-202-25-4.pdf.

Load Serving Entity's pro rata share of the total Daily Unforced Capacity Obligations across all Zones in the PJM Region for all days within each calendar month covered by Order No. 202-25-4." PJM 202c Cost Allocation Transmittal, FERC docket ER25-2653-000, Accession No. 20250626-5181 at 4 (June 26, 2025). PJM also explained that Constellation would be compensated for Eddystone operation pursuant to the Initial Order "using the Deactivation Avoidable Cost Credit ("DACC")-based formula rate methodology and processes set forth in Tariff, Part V, sections 114, 115, 116, 118, and 118A with refinements to ensure recovery of incurred costs including, but not limited to, the Eddystone Units' maintenance and necessary repairs." *Id.* at 2. FERC approved PJM's proposed cost allocation on August 15, 2025. *PJM Interconnection, L.L.C.*, 192 FERC ¶ 61,159 (2025). In an August 29 electronic communication to members, PJM's Senior Director of Stakeholder Affairs explained that "[g]iven the new DOE order is a clear extension of the prior order, and is limited to 90 days," PJM would seek a vote from its members on September 25 to extend the terms of the prior cost allocation methodology to November 26, 2025. Ex. 7.

### C. The Department's Resource Adequacy Report

The Department issued the RAR on July 7, 2025, in response to the Grid EO. The RAR purports to be a "uniform methodology to identify at-risk region(s) and guide reliability interventions" as directed by the Grid EO. Ex. 3 at vi. Several Public Interest Organizations, including many of the undersigned, as well as the Maryland Office of People's Counsel; the Attorney Generals of Maryland, Washington, Illinois, Michigan, Minnesota, Arizona, Colorado, Connecticut, and

New York; and the American Clean Power Association, Advanced Energy United, and American Council on Renewable Energy, submitted requests for rehearing on the RAR.[21]

As detailed in the Public Interest Organizations' Request for Rehearing on the RAR, the RAR does not support a finding of any emergency within the meaning of Section 202(c). The Department finds in the RAR that, under the current system, only ERCOT fails to achieve DOE's selected resource adequacy targets. Ex. 3 at 7. The Department's findings in the RAR conflict with its claims in the Renewed Order of an emergency in PJM; rather, the conclusions of the RAR agree with Public Interest Organizations that there is no short-term emergency. While DOE concludes in the RAR that there will be broader resource adequacy issues in 2030, this conclusion relies on overstated assumptions about demand growth and likely retirements and understated assumptions about likely new entry, building into the RAR an inherent bias toward a finding of inadequate resource adequacy. More fundamentally, the RAR acknowledges that DOE lacked type of data and in-depth engineering assessments that form the necessary bases for issuance of 202(c) orders, rendering the report useless for any practical purpose. *Id.* at i. DOE responded to the requests for rehearing on September 5, 2025, clarifying that the "RAR is simply a report" that "contains no directives" and imposes no "legal duties,"

---

[21] Public Interest Organizations' request for rehearing is attached as Ex. 13.

22

and as such, it is not an "order" by which the parties are "aggrieved," as is required to seek rehearing under section 313 of the Federal Power Act.[22]

## D. The Renewed Order

On August 27, 2025, the Department issued Order No. 202-25-8, the Renewed Order. The Department reiterated the reasons it had issued the Initial Order—none of which focused on resource adequacy concerns over the pendency of either the Initial or Renewal Orders. The Renewed Order then asserted that the "emergency conditions that led to the issuance of [the Initial Order] continue, both in the near and long term." Ex. 1 at 2. The Renewed Order provides essentially post hoc rationale for the Initial Order, explaining in a cursory fashion how much the Eddystone Units ran in June and July but providing no information on what else was occurring in PJM during these periods. The Renewed Order then attempts to extrapolate from the claimed summer emergency conditions evidence that "the Eddystone Units will continue to be critical to maintaining reliability in PJM" through November. *Id.* at 2-3. The vast majority of the Renewed Order, however, is focused on "a *potential* longer term resource adequacy emergency in the PJM region," *id.* at 3 (emphasis added), relying on PJM's 2023 Energy Transition in PJM report, PJM President Manu Asthana's March 2025 congressional testimony, the results of PJM's FERC-approved Reliability Resource Initiative, the North American Electric Reliability Corporation's ("NERC's") 2024 Long-Term Resource Assessment, Executive Orders, and the Department's July 2025 RAR. Thus, the

---

[22] Letter from DOE to Caroline Reiser, et al. dated Sept. 5, 2025 Re: August 8 Submission (attached as Ex. 24).

Renewed Order mandates that the Eddystone Units remain in operation until November 26, 2025.

As part of that mandate, the Department orders PJM and Constellation to "take all measures necessary to ensure that the Eddystone Units are available to operate." *Id.* at 6. PJM is further ordered "to take every step to employ economic dispatch of the Eddystone Units to minimize cost to ratepayers," *id.*, however, the Renewed Order also explains that "[b]ecause this Order is predicated on the shortage of facilities for generation of electric energy and other causes, the Eddystone Units shall not be considered capacity resources." *Id.* at 7. The Renewed Order also includes various reporting requirements and instructs PJM and Constellation to file tariff revisions or waivers necessary to effectuate the order.

## V. REQUEST FOR REHEARING

Section 202(c) confers an extraordinary power; it permits the Department to command action from market participants and to do so freed from core procedural safeguards, jurisdictional boundaries, and substantive limitations that undergird the rest of the Federal Power Act. *See* 16 U.S.C. § 824a(c). It comes as no surprise, then, that when Congress granted this power, Congress narrowly tailored its use to extraordinary circumstances. Simply, the Renewed Order exceeds the Department's authority because this is not one of those extraordinary circumstances. There is no emergency within the meaning of Section 202(c).

The Renewed Order fails to meet the standards of Section 202(c) both because the Department does not demonstrate that any emergency currently exists and because the resource adequacy concerns it does describe are long-term

24

concerns, that DOE has not even asserted, much less provided a credible projection, will ripen into actual supply shortages that could not be met through PJM's capacity markets, or pre-existing contingency planning processes. As a command and control order, the Renewed Order will also undermine competitive markets, thereby undercutting the Department's purported goals of increased long-term energy generation. The terms of the Renewed Order do not meet the claimed emergency or serve the public interest, do not fall within other limits on the Department's jurisdiction, and do not specify the requisite environmental conditions. For all of these reasons, the Department should withdraw the Renewed Order.

## A. The Renewed Order is Contrary to Law

Section 202(c) only authorizes the Department to respond to specific, imminent, unexpected, and temporary events, not to mandate generation based on longer-term reliability concerns. The plain language and structure of Section 202(c), the legislative history for the provision, the Federal Power Act overall, as well as case law interpreting Section 202(c), the Department's regulations, and its historic use of Section 202(c) all establish that an "emergency" under Section 202(c) must be sudden, unexpected, imminent, and specific.

1. Section 202's Text and Structure Establish that Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.

Section 202(c)'s text and context confirm that it provides authority for the limited purpose of addressing imminent, near-term, and concrete electricity supply shortfalls requiring immediate response; it does not permit the Department to act

based merely on concerns over long-term reliability or vague and unsubstantiated short-term concerns.  Had Congress intended to vest regulatory authority over long-term reliability or non-specific short-term reliability concerns in Section 202(c), it would have stated so clearly.  But it did not.[23]

The statute's text empowers the Department to act only upon "emergency." 16 U.S.C. § 824a(c).  The statute itself does not define "emergency."  At the time Congress enacted Section 202(c), Webster's New International Dictionary of the English Language (1930) defined "emergency" as a "*sudden* or *unexpected* appearance or occurrence... An *unforeseen* occurrence or combination of circumstances which calls for *immediate* action or remedy; *pressing* necessity; exigency."  (emphasis added).[24]  Contemporary dictionaries similarly define "emergency" as demanding imminence: an emergency is "an *unforeseen* combination of circumstances or the resulting state that calls for *immediate* action."[25]

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency": the authority granted by Section 202(c) is, in the first

---

[23] Congress amended Section 202(c) in 2015, but it did not alter the description of conditions that trigger the Department's grant of authority to issue emergency orders; it only addressed occasions on which a Department order might produce a conflict with other laws. *See* H.R. Rep. No. 114-357 § 61002 (2015).

[24] *See also* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added).

[25] *Emergency*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/emergency (last visited June 27, 2025) (emphasis added)); *See also* Benjamin Rolsma, The New Reliability Override, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

instance, a wartime power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section 202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").

The text's use of the present tense also underscores that focus on imminent and certain shortfalls: it empowers the Department to act only where "an emergency *exists*." 16 U.S.C. § 824a(c) (emphasis added). That near-term focus, along with the statute's strictly "temporary" authority, 16 U.S.C. § 824a(c), precludes use of Section 202(c) to pursue long-term policy goals, such as a preference for a particular fuel source, or to redress uncertain, vague, short-term concerns. *Richmond Power & Light*, 574 at 615 (Section 202(c) "is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor."). The Administration's self-contradictory actions—declaring an energy emergency while

illegally blocking the development of other sources—lays bare that promoting a particular preferred fuel source over others is exactly what is occurring here.[26]

Section 202's overall structure further highlights Section 202(c)'s emphasis on imminent, concrete, near-term concerns. The preceding subsections 202(a) and (b) together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. 16 U.S.C. § 824a(a) (seeking "abundant supply of electric energy" by directing the federal government to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy") & § 824a(b) (allowing the federal government to order "physical connection . . . to sell energy or to exchange energy" upon application, and after an opportunity for hearing). The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an instruction to establish a general framework meant to facilitate "coordination by voluntary action;" in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural

---

[26] *Compare* Energy Emergency EO *with* Nichola Groom, Reuters, A timeline of Trump's moves to dismantle the US wind and solar energy industries (Aug. 27, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/timeline-trumps-moves-dismantle-us-wind-solar-energy-industries-2025-08-26/#:~:text=The%20Interior%20Department%20said%20it,energy%20to%20low%2D income%20communities. Diana DiGangi, UtilityDive, *Revolution Wind to resume construction after judge grants injunction* (Sept. 23, 2025) https://www.utilitydive.com/news/revolution-wind-orsted-offshore-wind-stop-work-trump-construction/760803/; *Revolution Wind, LLC v. Douglas J. Burgum*, D.D.C. No. 1:25-cv-02999-RCL.

and substantive requirements, when "interconnection cannot be secured by voluntary action;" and in subsection (c), "much broader" but "temporary" authority "to compel the connection of facilities and the generation, delivery, or interchange of energy during times of war or other emergency."  S. Rep. No. 74-621 at 49 (1935).

That tiered structure—relying on voluntary action for quotidian energy planning, specifying limited authority where that voluntary system fails, and allowing for "temporary" central command-and-control only in case of "emergency"—requires that Section 202(c) remain narrowly bounded to instances of an immediate and unavoidable "break-down in electric supply," *id.*, rather than mere want of more abundant supply in the future, *cf.* Ex. 1 at 2 (imposing responsibility on PJM "to ensure maximum reliability on its system").  Interpreting Section 202(c)'s "emergency" powers to encompass longer-term concerns—e.g., potential shortfalls years into the future—would unwind the careful balance of voluntary, market-driven action and federal power set out in subsections 202(a) and 202(b).  *See infra*, Section V.C.  Such an interpretation cannot be squared with the statutory text and structure.  *See Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232, 233-34 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable future").

> 2. Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms that Section 202(c) Cannot be Expanded to Impose Requirements Related to Long-Term Reliability.

That Section 202(c) cannot be used to enforce the Department's view of long-term reliability needs is confirmed by Section 215 of the Federal Power Act—which

specifically and directly delineates the scope of federal power to enforce mandatory long-term reliability requirements.  16 U.S.C. § 824o ("Section 215").  Congress added Section 215 to the Federal Power Act in 2005 precisely because the Act as it then existed—including Section 202(c)—did not provide the federal government with the power to enforce measures designed to ensure broad, long-term reliability.  *See* 70 Fed. Reg. 53,117, 53,118 ("In 2001, President Bush proposed making electric Reliability Standards mandatory and enforceable," leading to enactment of Section 215 in 2005); Report of the National Energy Policy Development Group (May 2001) at p. 7-6[27] (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "[o]ne factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on *voluntary* compliance," and then recommending "legislation providing for enforcement" of reliability standards) (emphasis added); S. Rep. No. 109-78 at 48 (2005) (Section 215 "changes our current voluntary rules system to a mandatory rules system" for long-term reliability).  *See Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").

By enacting Section 215, Congress provided a comprehensive and carefully circumscribed scheme to empower FERC to enforce long-term reliability

---

[27] Available at https://www.nrc.gov/docs/ml0428/ml042800056.pdf.

requirements.  That statutory scheme strikes a careful balance between state and federal authority, and between private, market-driven decisions and top-down control.  Reliability standards are devised by NERC independent "of the users and owners and operators of the bulk-power system" but with "fair stakeholder representation."  16 U.S.C. § 824o(c)-(d).  *See also id.* § 824o(a)(3) (defining reliability standards as "a requirement . . . to provide for reliable operation of the bulk-power system").  FERC may approve or remand those standards (but not replace them with its own) and is required to "give due weight" to NERC's "technical expertise" while independently assessing effects on "competition."  *Id.* § 824o(d)(2)-(4).  Section 215 provides specified enforcement mechanisms and procedures for reliability standards.  *Id.* § 824o(e).  And it carefully preserves state authority over "the construction of additional generation" and in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards.  *Id.* § 824o(i)-(j).  FERC has employed this authority in recent years to ensure adequate generation during stressed grid events.  For instance, following Winter Storm Uri, which caused unprecedented power outages in the South Central United States, FERC directed NERC to develop cold weather reliability standards to address freezing issues that cause outages at thermal generators during winter storms.[28]  FERC approved NERC's standards in 2023 and directed further action.

---

[28] *See* FERC Approves Extreme Cold Weather Reliability Standards, Directs Improvements, Feb. 16, 2023, https://www.ferc.gov/news-events/news/ferc-approves-extreme-cold-weather-reliability-standards-directs-improvements.

Interpreting Section 202(c) to permit the Department to mandate generation based on its declaration that non-imminent reliability concerns create an "emergency" would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state power.  Such a bypass would impermissibly "contradict Congress' clear intent as expressed in its more recent," reliability-specific "legislation," enacted "with the clear understanding" that the Department had "no authority" to address long-term reliability through Section 202(c).  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 & 149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one section of the Federal Power Act "is strong evidence that [a separate section] confers no such authority on [agency].").  Congress has, in Section 215, directly established the mechanisms (and limitations) by which the federal government may compel action to ensure long-term electric-system reliability.  In so doing, it has confirmed that the word "emergency," in Section 202(c), does not extend to long-term reliability concerns.

3. Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.

The Department's regulations demonstrate its own long-standing understanding that Section 202(c)'s authority is confined to imminent and unavoidable resource shortages, rather than long-term reliability concerns.  The regulations define an emergency as "an *unexpected* inadequate supply of electric energy which may result from the *unexpected* outage or breakdown" of generating

or transmission facilities—not a means of planning against distant expectations or risks.  10 C.F.R. § 205.371 (emphasis added).  Emergencies "may result" from a number of events.  *Id.* ("may result from the unexpected outage," "may be the result of weather conditions," "can result from a sudden increase in customer demand").  The use of the verb "result," defined as "arise as a consequence, effect, or conclusion,[29] suggests that the event triggering the emergency has already happened rather than that there is a speculation that it could occur.  Moreover, the events are characterized by those produced by "weather conditions, acts of God, or *unforeseen* occurrences not reasonably within the power of the affected 'entity' to prevent," *id.* (emphasis added), not an event that can be planned for because there is a forecasted risk.  Where the culprit is increased demand, it must be "a *sudden* increase in customer demand" producing a "*specific* inadequate power supply situation," *id.* (emphasis added), rather than long-term demand projections producing general reliability concerns.  The need for both specificity and certainty is repeated in the Department's regulations defining an inadequate energy supply: "A system may be considered to have" inadequate supply when "the projected energy deficiency . . . *will* cause the applicant [for a 202(c) Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it *is* unable to supply adequate electric service to its customers."  10 C.F.R. § 205.375 (emphasis added).

---

[29] *Result*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/result (last visited June 27, 2025).

And while the regulations suggest that "inadequate planning or the failure to construct necessary facilities *can result* in an emergency," they recognize that the Department may not utilize a "continuing emergency order" to mandate long-term system planning.  10 C.F.R. § 205.371 (also recognizing that "where a shortage of electricity is projected due solely to the failure of parties to agree to terms, conditions, or other economic factors" there is no emergency "unless the inability to supply electric service is *imminent*") (emphasis added).  An emergency may exist where past planning failures produce an immediate, present-tense shortfall (that is where, a shortfall *results* from insufficient planning); the Department has no authority to commandeer long-term planning merely because it deems current plans inadequate to meet far-distant needs.  *See* 10 C.F.R. § 205.375 (requiring present inability to meet demand to demonstrate inadequate energy supply).  As the Department stated when it promulgated those regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems."  46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981).

The Department cannot simply depart from its regulations without conducting new notice and comment rulemaking and providing reasonable basis for the change. *See* 5 U.S.C. § 553; *New England Power Generators Ass., Inc. v. FERC*, 881 F.3d 202, 210–12 (D.C. Cir. 2018) ("It is textbook administrative law that an agency must provide[ ] a reasoned explanation for departing from precedent or treating similar situations differently.") (quoting *W. Deptford Energy, LLC v.*

34

*FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014)); *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Env't Integrity Project v. EPA*, 425 F.3d 992, 995 (D.C. Cir. 2005) ("[A]n interpretation of a legislative rule cannot be modified without the notice and comment procedure that would be required to change the underlying regulation— otherwise, an agency could easily evade notice and comment requirements by amending a rule under the guise of reinterpreting it.") (internal citations omitted).

4. Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises.

Two courts have addressed the scope of authority under Section 202(c), and both determined that this Section applies only when there is a sudden, unexpected, imminent, and specific emergency.

*Richmond Power and Light of City of Richmond, Indiana v. FERC*, 574 F.2d 610 (D.C. Cir. 1978) arose out of the 1973 oil embargo. The Federal Power Commission ("Commission") needed to decide how to respond to oil shortages, and decided to call for the voluntary transfer of electricity from non-oil power plants to areas of the country that relied heavily on oil, such as New England. *Id.* at 613. The New England Power Pool was not convinced that the voluntary program would work and petitioned the Commission for a 202(c) order. *Id.* The Commission instead facilitated an agreement between state commissions and supplying utilities, which satisfied the New England Power Pool and it withdrew its petition. *Id.* A dissatisfied utility sought judicial review of the Commission's decision to allow the withdrawal of the Section 202(c) petition. *Id.* at 614.

The court easily upheld the Commission's decision not to invoke Section 202(c). *Id.* Though the oil embargo had ended, the utility argued that the "high cost and uncertain supply of imported oil" justified an emergency order. *Id.* The Commission countered that the voluntary program had worked, the New England Power Pool never interrupted service, and there was no need for a Section 202(c) order. *Id.* at 615. The court agreed with the Commission. *Id.*

Trying another tactic, the utility argued that "dependence on imported oil leaves this country with a *continuing* emergency." *Id.* (emphasis added). The court observed that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." *Id.* Interpreting this statutory language, the court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor." *Id.* Section 202(c) is not an appropriate means to implement long-term national policy to switch fuels. It is only a temporary fix for a temporary problem.

The Eighth Circuit has similarly held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970), a utility insisted that the only way for the Commission to properly order the utility to connect to a municipal power provider was to issue a Section 202(c) order. Demand for electricity in the city had increased, and the peak load of the municipal power provider was getting to be so high that both of its two generators would likely need to be used simultaneously in the near future, "causing a possible loss of service should one malfunction during a peak period." *Id.* at 233-

34.  To avoid this possible loss of service, the Commission issued a Section 202(b)

order, requiring the utility to connect the municipal power provider.  *Id.* at 234.

The utility argued that the Commission used the wrong section and should have

used Section 202(c) instead.  *Id.*

The court explained that Section 202(c) "enables the Commission to react to a

war or national disaster" by ordering "immediate" interconnection during an

"emergency."  *Id.* (citing 16 U.S.C. § 824a(c)).  For non-emergency situations, "[o]n

the other hand, § 202(b) applies," including when there is a "crisis which is likely to

develop in the foreseeable future but which does not necessitate immediate action

on the part of the Commission."  *Id.*  The court upheld the Commission's use of

Section 202(b) instead of Section 202(c) because there was no immediate emergency.

The case law uniformly supports the interpretation that Section 202(c) can

only be used in acute, short-term, urgent emergencies.

> 5.  The Department's Prior Orders Recognize that Section 202(c) Does Not
>     Confer Plenary Authority Over Long-Term Resource Adequacy.

The Department's consistent application of Section 202(c) further

corroborates the urgency of the conditions necessary to invoke the provision.  *See*

*FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941) ("[J]ust as established

practice may shed light on the extent of power conveyed by general statutory

language, so the want of assertion of power by those who presumably would be alert

to exercise it, is equally significant in determining whether such power was actually

conferred.").  The Department has only ever used Section 202(c) to address specific,

imminent, and unexpected shortages—never to address longer-term reliability

concerns or demand forecasts. *See, e.g.,* Ex. 10, DOE Order No. 202-22-4 (Dec. 24, 2022) (responding to ongoing severe winter storm producing immediate and "unusually high peak load" between December 23 and December 26); Ex. 11, DOE Order 202-20-2 (Sept. 6, 2020) at 10-2 (responding to shortages produced by ongoing extreme heat and wildfires); *see also* Rolsma, 57 Conn. L. Rev. at 803-4 (describing "sparing[]" use of Section 202(c) outside of wartime shortages during the twentieth century). The Department has also narrowly tailored the remedies in Section 202(c) orders to ensure that the orders only address the stated emergency, to limit the order to the minimum period necessary, and to mitigate violations of environmental requirements and impacts to the environment. *See, e.g.,* Ex. 10 at 4-7 (limiting order to the 3 days of peak load, directing PJM to exhaust all available resources beforehand, requiring detailed environmental reporting, notice to affected communities, and calculation of net revenue associated with actions violating environmental laws); Ex. 11 at 3-4 (limiting order to the 7 days of peak load, directing CAISO to exhaust all available resources beforehand, requiring detailed environmental reporting).

Public Interest Organizations are not aware of any instance in which the Department has utilized Section 202(c) to mandate generation the Department views as necessary to ensure long-term resource sufficiency, or to retain fuel sources that the Department believes beneficial, *Richmond Power and Light,* 574 F.2d at 616—and for good reason.

### B. There Is No Factual Basis Supporting the Department's Order.

The Department asserts that the Renewed Order is justified by the continued "emergency conditions" cited in the Initial Order, "both in the near and long-term." Ex. 1 at 2. However, as with the Initial Order, the Department fails to demonstrate that there is an emergency under Section 202(c). The Department's citations to Executive Orders do not save it. A broad, generic, Presidential declaration of a national emergency is not sufficient on its own to justify the use of emergency powers under a statute with specific requirements. And the specific statutory requirements have not been met here. The Department offers no plausible evidence that a shortfall in energy will occur in PJM in the next 90 days; summer is over and the Department misrepresents the capacity outlook for autumn. The Department cannot reasonably rely on the running of the Eddystone Units in June and July as evidence of need for the Units over the next 90 days, and any attempt to bolster the Initial Order with this information is both impermissible post hoc rationale and misrepresents the PJM alert system. Further, the Department's reiteration of stale, overly general, or otherwise inapposite evidence it relied upon in the Initial Order continues to fail to establish that an emergency exists pursuant to Section 202(c). The evidence offered cannot counter the fact that PJM procured an adequate amount of capacity to meet the region's Reliability Requirement at least through the 2026-2027 delivery year (which will begin on June 1, 2026 and end May 30, 2027). The Department has not and cannot establish a factual basis to support the Renewed Order.

1. Neither the Energy Emergency Nor the Grid Executive Order Evince an Emergency Redressable By Section 202(c).

In the Renewed Order, the Department notes that the Initial Order was preceded by two executive orders "underscor[ing] the dire energy challenges facing the Nation," citing the Energy Emergency EO and the Grid EO.

These Executive Orders do not provide a valid basis for an emergency under Section 202(c). Even if these declarations were accurate and reasonable, which they are not, presidential declarations of an emergency do not unlock unlimited powers. *See Biden v. Nebraska*, 600 U.S. 477, 500-01 (2023) (presidential declaration of national emergency does not change the limitations on agency's emergency authority as written into statute). President Trump issued the Energy Emergency EO pursuant to authority from the National Emergencies Act (and provided no statutory basis for the Grid EO.)[30] Congress explained that the National Emergencies Act "is not intended to enlarge or add to Executive power. Rather, the statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers *conferred on him by other statutes*." S. Rep. No. 94-1168, 3 (1976) (emphasis added). Congress sometimes ties emergency authority to a president's declaration of a national emergency and

---

[30] Under the National Emergencies Act, no emergency powers unlocked by a Presidential declaration of a national emergency "shall be exercised unless and until the President *specifies the provisions of law* under which he proposes that he, or other officers will act." 50 U.S.C. § 1631 (emphasis added). The Energy Emergency EO does not adhere to this requirement. EO 14,156 (Jan. 20, 2025) (generically directing agencies to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the … generation of domestic energy resources.").

sometimes to a determination by the head of an agency. The Federal Power Act contains both types of emergency authority: two provisions of the Federal Power Act provide the President with emergency authority (sections 215A and 212, 16 U.S.C. § 824o-1 and 16 U.S.C. § 809), but Section 202(c) requires that "the *Commission* determine[] that an emergency exists." 16 U.S.C. § 824a (emphasis added).[31] Thus, the burden is on the Department to demonstrate that there is an emergency pursuant to the narrow language of Section 202(c); simply pointing to Executive Orders without determining for itself that an emergency exists results in an arbitrary and capricious order.

Additionally, neither the Energy Emergency nor the Grid EO contain any facts or sources that support the determination of an emergency under Section 202(c). The Energy Emergency EO generically claims "[t]he energy ... generation capacity of the United States [is] far too inadequate to meet our Nation's needs." The Grid EO also claims that the country is "experiencing an unprecedented surge in electricity demand," generically pointing to expansions of data centers and increases in domestic manufacturing as demand drivers. These vague statements on nationwide energy needs are far too non-specific to justify a 202(c) order. *See* 10 C.F.R. 205.371 (defining an emergency under Section 202(c) as "a *specific* inadequate power supply situation") (emphasis added). The Executive Orders provide no evidence in support of their claims of inadequate nationwide generation,

---

[31] The Department has exercised certain powers under Section 202(c) since the DOE Organization Act of 1977, 42 U.S.C. § 7172.

let alone in Pennsylvania specifically.[32]  An emergency under Section 202(c) also must be imminent.  *See supra*, Section V.A.  But the Energy Emergency EO only gestures to a "deteriorat[ion] in *the near future*" and the Grid EO offers no projection for the timing or location of the expected increased demand from "rapid technological advancements."  As we demonstrate *infra*, Section V.B.3, there is sufficient generation for the claimed "emergency" period in Pennsylvania.

Moreover, these Executive Orders, which emphasize the need for more energy, are contradicted by other Executive Orders, which constrain the energy supply.  By Executive Order, the President attempted to temporarily withdraw land to prevent "renewed wind energy leasing for the purposes of generation of electricity," although not for oil and gas mining.[33]  Another Executive Order declares that there is no need to subsidize "energy sources like wind and solar."[34]  Other federal agencies have taken several actions, pursuant to these Executive Orders, to stop wind and solar development.[35]  If there is a national energy

---

[32] Indeed, U.S. energy production and exports are currently at an all-time high.  *See* U.S. Energy Information Administration, U.S. primary energy production, consumption, and exports increased in 2024 (Jun. 20, 2025), https://www.eia.gov/todayinenergy/detail.php?id=65524.

[33] Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363, 8363 (Jan. 29, 2025).

[34] Exec. Order No. 14,315, 90 Fed. Reg. 30821, 30821 (July 7, 2025).

[35] *See* Department of Interior Memo on Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities (July 15, 2025); Department of Interior Secretary Order 3437: Ending Preferential Treatment for Unreliable, Foreign Controlled Energy Sources in Department Decision-Making (July 29, 2025); Department of Interior

emergency, why is the Administration preventing the development of shovel-ready and economic energy projects?

Notably, the Renewed Order, like the two Executive Orders it cites, supports fossil fuels. The Grid EO was issued at the same time as three other executive actions aimed at supporting the coal industry, and was announced at a White House political event focused on promoting coal. *See* Lisa Friedman and Brad Plumer*, Five Takeaways From Trump's Plan to Rescue Coal, N.Y. Times (Apr. 9, 2025),

https://www.nytimes.com/2025/04/09/climate/trump-executive-orders-coal.html?unlocked_article_code=1.oU8.ykUp.ZFaHwmWlt5nX&smid=url-share

(attached as Ex. 12). But a preference for one type of fuel over another also does not constitute an emergency. *Richmond Power and Light*, 574 F.2d at 610 (Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor."). And the Administration cannot manufacture an

_____

Secretary Order 3438: Managing Federal Energy Resources and Protecting the Environment (August 1, 2025); BOEM, BOEM Rescinds Designated Wind Energy Areas on the Outer Continental Shelf (July 30, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-designated-wind-energy-areas-outer-continental-shelf; BOEM, BOEM Rescinds Offshore Renewable Energy Leasing Schedule (August 4, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-offshore-renewable-energy-leasing-schedule; Department of Interior, Interior Department Moves to Cancel Reckless Biden-era Approval of Lava Ridge Wind Project (Aug. 6, 2025), https://www.doi.gov/pressreleases/interior-department-moves-cancel-reckless-biden-era-approval-lava-ridge-wind-project; BOEM, Director's Order (Aug. 22, 2025) (Revolution Wind Stop Work Order), https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf; BOEM, Director's Order (Apr. 16, 2025) (Empire Wind Stop Work Order), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf.

emergency by eliminating new sources of energy in order to extend the life of old, dirty, unreliable plants.

### 2. There is No Near-Term Emergency

The Renewed Order gestures at the possibility of electricity shortfalls in the "near" term but offers no plausible evidence of such shortfalls. That to one side, the generalized, speculative risks described by the Renewed Order are neither specific nor certain enough to qualify as an "emergency" within the meaning of Section 202(c). 16 U.S.C. § 824a(c).

#### a. *Eddystone's operations in June and July 2025 do not indicate an ongoing emergency*

The Renewed Order's limited case for a near-term emergency rests almost entirely on operation of Eddystone during the summer—i.e., not the period of time in which the instant Order asserts that an emergency exists. The Renewed Order fails to connect the dots on how any past operation of Eddystone relates to whether an emergency condition might exist in the time period from August 28 to November 26. Moreover, PJM's summer operational experience, which included modest alerts that successfully avoided any kind of energy shortfall, does not indicate that generation by Eddystone was required during those events, much less that it is required during the period covered by this Renewed Order. As explained in Section V.B.2.c., below, fall is an extremely low-risk season on the PJM system. The Department's unsupported effort to extrapolate from a season with temperature extremes that may cause more challenging grid conditions to a mild season simply does not hold water.

The Renewed Order fails to support its assertions that Eddystone's operation on a handful of days during June and July was required to avert an emergency within the meaning of Section 202(c). Public Interest Organizations addressed Eddystone's June operation in the Initial RFR, which DOE has addressed neither through an order on rehearing, nor in the Renewed Order. The heat wave that occurred June 23-26, 2025, and PJM's response thereto, demonstrate that the PJM system is working as it should to maintain grid reliability—and it would have worked as planned even without the Eddystone Units running. On June 22, 2025, PJM projected that its forecasted load across PJM from June 23 through 26 would range from 148,500 to 161,000 MW.[36] While these load forecasts are higher than PJM's summer forecast peak, they are lower than PJM's extreme planning scenario of more than 166,000 MW and lower than the 187,100 MW of total generation capacity and demand response that PJM had available this summer.[37] Thus, PJM called on ordinary economic resources to respond to this event, but also had additional typical resources it could call on to address the peak forecasts, and still would have even without Eddystone operating. In fact, PJM was implementing

---

[36] June 23 Update: Maximum Generation Alert Issued for June 24, PJM Inside Lines (June 19, 2025), https://insidelines.pjm.com/pjm-issues-hot-weather-alert-for-expected-heat-wave-june-22-25/.

[37] *See* PJM Interconnection, PJM Summer Outlook 2025: Adequate Resources Available for Summer Amid Growing Risk, Inside Lines (May 9, 2025), https://insidelines.pjm.com/pjm-summer-outlook-2025-adequate-resources-available-for-summer-amid-growing-risk/.

standard procedures to manage peaking loads before they reach emergency levels.[38]

This procedure is called Pre-Emergency Load Management Reduction, which calls

upon PJM's plentiful demand response resources to reduce load.[39] Ultimately, PJM

hit a peak load of approximately 161,770 MW on June 23 and 162,401 MW on June

24,[40] which is below its all-time peak load set in 2006.[41] PJM dispatched both short

and long-lead time demand response resources,[42] but not quick demand response,

---

[38] PJM, PJM Manual 13: Emergency Operations, at 20-21 (Feb. 20, 2025), https://www.pjm.com/-/media/DotCom/documents/manuals/m13.pdf.

[39] While this is an action under PJM's Capacity Emergency, *see id.*, PJM's Operating Agreement explains that "[a] pre-emergency event is implemented when economic resources are not adequate to serve load and maintain reserves or maintain system reliability, and prior to proceeding into emergency procedures." *See* PJM Operating Agreement at Schedule I, Section 8.5, https://www.pjm.com/pjmfiles/directory/merged-tariffs/oa.pdf.

[40] *See* PJM, Hot Weather Operations June 22-26, 2025 at slide 4, https://www.pjm.com/-/media/DotCom/committees-groups/committees/oc/2025/20250710/20250710-item-10---june-2025-hot-weather-update.pdf; June 24 Update: Maximum Generation Alert Extended to June 25, Inside Lines (June 24, 2025) https://insidelines.pjm.com/june-24-update-maximum-generation-alert-extended-to-june-25/; PJM Prices Spike After Record Peak Demand in June, Factset Insight, (July 21, 2025) https://insight.factset.com/pjm-prices-spike-after-record-peak-demand-in-june.

[41] PJM Hot Weather Operations June 22-26, at slide 4.

[42] *See* PJM Pre-Emergency Load Management Reduction Action, Message ID 104654, June 23, 2025, https://emergencyprocedures.pjm.com/ep/pages/viewposting.jsf?id=104654 (dispatching long lead time capacity performance demand response resources); PJM Pre-Emergency Load Management Reduction Action, Message ID 104655, June 23, 2025 (dispatching short lead time capacity performance demand response resources), https://emergencyprocedures.pjm.com/ep/pages/viewposting.jsf?id=104655. On June 24, Pre-Emergency Load Management reduction actions were called for various sub-zones of PJM as well, but only for short- and long- lead time resources. See Emergency Procedures Message IDs Nos. 104668-104675, available at https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf#. On June 25, PJM

which represents at least another 3,640 MW of resources that could have been employed rather than running Eddystone Units 3 and 4.[43]

The event cited by the Renewed Order was not an emergency as defined by Section 202(c) because it did not produce a "specific inadequate power supply situation," 10 C.F.R. § 205.371. And Department regulations define an inadequate energy supply as when "the projected energy deficiency . . . will cause the [utility] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources."  10 C.F.R. § 205.375.  For this event, PJM kept net load below its summer seasonal peak load through relying on only some of its otherwise available resources (in the form of demand response).  Contrary to DOE's characterization, the June 23-26 event demonstrates that PJM's forecasting has been accurate, its standard operating procedures worked to manage load as it approached the forecast peak, and that PJM had sufficient capacity resources for summer 2025 and continues to have sufficient resource adequacy to meet near-term needs.

Likewise, PJM's July 2025 hot weather event did not exceed PJM's normal peak load requirements nor involve the utilization of "all of its otherwise available

---

again deployed long- and short-lead time demand response resources.  See Emergency Procedures Message IDs Nos. 104686 & 104687, https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf#.
    [43] James McAnany, PJM, 2025 Demand Response Operations Markets Activity Report (June 10, 2025), at page 3, Fig. 1 (showing 8,958 MW of demand response registrations in PJM for summer 2025) and page 6, Fig. 5 ("Figure 5: DY 25/26 Confirmed Load Management DR Registrations Lead Times"), https://www.pjm.com/-/media/DotCom/markets-ops/dsr/2025-demand-response-activity-report.pdf (45.5% of total 25/26 demand response is quick).

resources." 10 C.F.R. § 205.375. PJM's load on these July days peaked at around 155,000 MW,[44] well below the peak load PJM capably served during the June event, its historic peak load, and its extreme summer planning scenario level. During summer 2025, PJM had nearly 8,000 MW of Load Management resources available across the PJM RTO.[45] Out of 7,999 MW, 45.5% are "quick" resources—nearly 3,640 MW—able to reduce load within 30 minutes, giving PJM a large pool of fast-acting demand reduction.[46] During July 28 and 29, PJM never deployed more than 4,000 MW of demand response.[47] As explained above concerning the June operation, the July event does not meet statutory or regulatory definition of an emergency.

Furthermore, publicly available information about Eddystone is limited to the dates the units ran and the number of hours on each date—PJM has provided no public information regarding the level of output produced by either of the two units on particular dates, creating a gap in the record as to how much either unit actually ran during the times when PJM invoked various pre-emergency planning

---

[44] Gridstatus.io, Load – PJM, https://www.gridstatus.io/live/pjm?date=2025-07-28to2025-07-30.

[45] Figure 1: DY 25/26 Active Participants in DR Programs, 2025 Load Response Activity Report September 2025 available at https://www.pjm.com/-/media/DotCom/markets-ops/dsr/2025-demand-response-activity-report.pdf.

[46] PJM, 2025 Demand Response Operations Markets Activity Report: September 2025, Figure 5: DY 25/26 Confirmed Load Management DR Registrations Lead Times, https://www.pjm.com/-/media/DotCom/markets-ops/dsr/2025-demand-response-activity-report.pdf.

[47] PJM, Estimated Demand Response Activity July 28 and 29, 2025 at 4-5, https://www.pjm.com/-/media/DotCom/markets-ops/demand-response/dispatched-demand-response-July-28-29-2025.pdf.

procedures in June and July.[48]  Citing EPA's Clean Air Markets Program Data, the Renewed Order notes that the two units ran for over 17,000 MWhs in June.  Ex. 1 at 2.  Over the 122 hours that PJM reports the two units ran in June, this suggests an average capacity factor of about 18% for the two units in each hour.  This low level of operation suggests that two units were operated mostly at their economic minimum, in ready status, rather than being dispatched to meet load.[49]  Operating at or close to the plant's economic minimum most likely means that the plants were started up well ahead of when they might possibly have been needed due to their long start-up times.  As the U.S. Energy Information Administration explains, steam turbine technology like that used at the nearly 60-year-old Eddystone units,[50]

---

[48] *See* PJM Compliance Reports, *supra* note 20.

[49] An analysis of hourly generation of six oil- and gas-fired steam turbine power plants shows the average economic minimum operating level is approximately 32% of nameplate capacity. This level is likely reflective of the economic minimum operating level of the similarly aged Eddystone Units 3 and 4. The average minimum load for steam turbines over 55 years old in the U.S. is 28.2%, which represents the physical minimum operating level. Sustained minimum operating levels are typically higher to account for emissions limits, economic constraints, and other operational limitations.  U.S. Energy Information Administration, Form EIA-860 Detailed Data: Annual Electric Generator Report (2024), https://www.eia.gov/electricity/data/eia860/; U.S. Environmental Protection Agency, Clean Air Markets Program Data (CAMPD): Hourly Emissions and Generation Data (2024), https://campd.epa.gov/; S&P Global Market Intelligence, S&P Capital IQ Pro, Power Plant Profile Data (accessed under private license, 2024).

[50] Constellation Energy, Eddystone Generation Station, https://www.constellationenergy.com/our-company/locations/location-sites/eddystone-generating-station.html ("These units were installed between 1967 and 1970").

requires hours to start up and cannot rapidly adjust output once online.[51] This means that the Eddystone units, even once online, would likely not have been able to ramp up quickly to address any emerging system needs. The reliability of these units overall is questionable. Unit 4 suffered an outage of unknown provenance on June 23,[52] and on July 28 failed to start up at all due to a tube leak.[53]

At no time during June or July, and specifically during the times when the Eddystone units were operated, did PJM declare a capacity emergency that would trigger a Performance Assessment Interval for committed capacity units.[54] In other words, PJM never reached the threshold it deems it necessary to enforce performance by resources that have been committed and paid to provide capacity during grid stress events. Absent such penalties, committed capacity resources may find it economically advantageous not to perform, for example, if they would incur high costs to acquire just-in-time fuel. As explained above, inadequate energy supply for the purposes of Section 202(c), according to Department regulations,

---

[51] U.S. Energy Information Administration, "About 25% of U.S. power plants can start up within an hour" November 19, 2020 https://www.eia.gov/todayinenergy/detail.php?id=45956.

[52] PJM Interconnection LLC Compliance Report, June 24, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250624-doe-compliance-report-for-eddystone-units-3-and-4.pdf.

[53] PJM Interconnection, LLC Compliance Report re: Eddystone Units 3 and 4 Submitted July 29, 2025 for operations on July 28, 2025, https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250729-pjm-report-in-compliance-with-ordering-para-b-of-doe-20250530-order-no-202-25-4.pdf.

[54] *See* PJM Interconnection, LLC, 184 FERC ¶ 61,058 P 2 (July 28, 2023) (describing the purpose of PJM's Performance Assessment Intervals in the course of approving PJM's proposed changes to the triggering conditions for these intervals).

involves a situation where "the projected energy deficiency . . . will cause the [utility] to be *unable* to meet its normal peak load requirements based upon use of *all of its otherwise available resources*." 10 C.F.R. § 205.375 (emphasis added). A situation in which capacity that consumers have already paid to be available is not even required to be available is not a situation in which "all . . . otherwise available resources" have been deployed.

   b. *Past PJM Hot Weather and Maximum Generation Alerts do not indicate an ongoing emergency*

The Order asserts that a near-term emergency exists because during the summer, PJM has "issued Hot Weather Alerts and/or Maximum Generation Alerts (EEA 1) covering a total of 20 days, including days in June, July, and August." Ex. 1 at 2. The issuance of Hot Weather and Maximum Generation Alerts does not indicate an emergency within the meaning of Section 202(c). A Hot Weather Alert, per PJM Business Practice Manual 13, Section 3.4, serves the purpose of "prepar[ing] personnel and facilities for extreme hot and/or humid weather conditions, which may cause capacity requirements and/or unit unavailability to be substantially higher than forecasted, and which are expected to persist for an extended period."[55] PJM members, such as transmission and generation owners, are expected to respond to these alerts by advising facility staff, updating the unit parameters reported in Markets Gateway, determining whether alternative fuel is

---

[55] PJM, PJM Manual 13: Emergency Operations, at 65 (Feb. 20, 2025), https://www.pjm.com/-/media/DotCom/documents/manuals/m13.pdf.

available, and reviewing plans to see whether any planned or ongoing maintenance or testing can be deferred, among other modest steps.[56]

The purpose of Maximum Generation Alerts, also known as Load Management Alerts, "is to provide an early alert that system conditions *may* require the use of the PJM emergency procedures.  It is implemented when Maximum Emergency generation is called into the operating capacity or if Demand Response is projected to be implemented."[57]  In conjunction with a Max Gen Alert, PJM issued a NERC Energy Emergency Alert (EEA) Level 1.  Member actions in response to a Max Gen Alert are similar to those of a Hot Weather Alert, with the additional step that members "suspend any high risk testing of generating or transmission equipment."[58]

Both Hot Weather and Maximum Generation Alerts are types of "Advanced Notice Emergency Procedures" in PJM operational practices, which are "issued one or more days in advance of the operating day for elevated awareness and to give

---

[56] *See id.* at 62.  *See also, e.g.*, PJM, Emergency Procedures Posting 104746: Hot Weather Alert, July 29, 2025, https://emergencyprocedures.pjm.com/ep/pages/viewposting.jsf?id=104746. PJM issued Hot Weather Alerts for portions of June 19 and 23, and July 3, 16, 22, 23, 24, 25, 28, and 29, though not all of these encompassed the zone in which Eddystone is located. *See* PJM, Emergency Procedures, https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf.

[57] PJM, PJM Manual 13: Emergency Operations, at 23 (Feb. 20, 2025), https://www.pjm.com/-/media/DotCom/documents/manuals/m13.pdf (emphasis added).

[58] *Id* at 24. During the term of the Initial Order, PJM issued Max Gen Alerts on June 22, 23, and 24, and July 14, 15, 23, 24, and 27-29. *See* https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf.

time for advanced preparations."[59] These alerts are intended to head off real-time

emergency procedures such as "warnings," which are "issued real-time, typically

preceding, and with an estimated time/window for a potential future Action" and

"actions," which are "issued real-time and requires PJM and/or Member response."[60]

Two other alerts, Primary Reserve and Voltage Reduction, follow Maximum

Generation, even before the first "warning" emergency step, as shown in the

following Exhibit from PJM Business Practice Manual 13.

   Before shedding any load, PJM's first "action" is to require curtailment

service providers to deploy demand response resources with 30-, 60-, or 120-minute

lead times via a Pre-Emergency Load Management Reduction Action.[61] The next

step is Emergency Load Management Reduction Action, which further reduces load

through PJM controllable load management reduction programs.[62] After further

warnings, PJM may issue a Maximum Emergency Generation Action (which is

different from the Maximum Generation Alert), the purpose of which is "to increase

the PJM RTO generation above the maximum economic level. It is implemented

whenever generation is needed that is greater than the highest incremental cost

level."[63] In this step, PJM takes actions such as determining the feasibility of

---

[59] PJM, PJM Manual 13: Emergency Operations, at 20 (Feb. 20, 2025),
https://www.pjm.com/-/media/DotCom/documents/manuals/m13.pdf.

[60] *Id.*

[61] *Id.* at 30.

[62] *Id.* at 30.

[63] *Id.* at 33-34.

recalling off-system capacity sales. Based on Emergency Bids submitted by generation resources internal to PJM and from neighboring Control Areas, PJM will incrementally load new generation resources as needed.[64] Following the Maximum Generation Emergency Action, PJM would take actions to deploy Voluntary Demand Response, and issue requests to curtail non-essential building load. Only after these steps would PJM issue the "Deploy All Resources" action, which requires generation owners to start up any offline resources and ramp to full output.[65] The next step is to reduce voltage on the system so as to reduce demand. Only after all of these steps are taken would PJM shed firm load.[66]

This timeline makes clear that the issuance of Hot Weather Alerts and Maximum Generation/Load Management Alerts are many steps removed from the type of emergency contemplated by Section 202(c). These alerts are issued before demand response resources are dispatched, before PJM ceases exports to neighboring regions, before all generators are required to ramp up to their maximum output, and before all offline generators are even required to start up. These alerts are part of PJM's preparedness for possibly tight grid conditions, not indicators that something is awry with PJM's system or that it has inadequate resources.

---

[64] *Id.* at 35.

[65] *Id.* at 38-39.

[66] *Id.* at 43.



*Exhibit 1: Emergency Levels*

    *c.  DOE fails to substantiate its assertion that any tight grid conditions will persist this fall.*

The Renewed Order attempts to leverage these typical summer grid management occurrences into evidence supporting an emergency order applicable in the autumn, by noting that "[t]he hot weather may continue in the near term, as the

Seasonal Outlook released by the National Oceanic and Atmospheric Administration (NOAA) on August 21, 2025, projects between a 40% and 60% probability of above-normal temperatures in the Mid-Atlantic region, which includes the PJM region, over the next three calendar months."[67]  A 50% chance of above-average autumn temperatures does not suggest tight, much less emergency grid conditions for two reasons.

First, higher-than-average fall temperatures (even if they occurred) are nowhere near the kinds of peak summer temperatures that have driven PJM's historic peak loads.  The NOAA Seasonal Outlook that the Renewed Order cites does not opine on the magnitude by which it predicts that fall temperatures might be higher than average.  However, according to historical NOAA data, the 3-month average temperature for the Mid-Atlantic basin is 54.1F and average humidity in Pennsylvania is 61% during the months of September, October, and November, for an average fall heat index of 52F.[68]  During the 2025 summer heat wave that drove PJM energy demand to third- and fourth-highest peak loads, the heat index ranged

---

[67] Renewed Order at 2-3 (citing Seasonal Outlook, NOAA Climate Prediction Ctr. (Aug. 21, 2025), https://www.cpc.ncep.noaa.gov/products/predictions/long_range/seasonal.php?lead=1).

[68] *See* National Centers for Environmental Information, *Climate at a Glance: Regional Time Series*. U.S. Department of Commerce, National Oceanic and Atmospheric Administration. https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/regional/time-series/217/tavg/3/11/2000-2025; Pennsylvania State Climatologist. *Means & Extremes*. The Pennsylvania State University. https://climate.met.psu.edu/data/state/pameans.php.  *See also*, National Weather Service, Heat Index Chart, https://www.weather.gov/ffc/hichart.

from 103-110F.[69]  In order to approach summer peak conditions, the fall heat index would have to be *98% higher* than average.  Without more evidence, DOE's citation of a 50/50 probability of somewhat higher fall temperatures is too thin a thread to show an emergency in the fall.

Second, fall is a very low risk time on the PJM system generally, in part due to these modest temperatures and heat indices.  According to PJM's loss of load analysis for 2025-2026, the 90 days in which this Order will be in effect encompass only 0.8% of PJM's modeled annual loss of load risk.[70]  As such, the Order's extrapolation of system conditions that may have occurred during the summer, when PJM load is generally high, to its lowest risk season, is unreasonable.

### 3.  PJM Has Sufficient Capacity Resources Without Eddystone

#### a.  *DOE rehashes evidence from its initial order that does not establish an emergency*

The Renewed Order asserts that "[t]he evidence also indicates that there is a *potential longer term* resource adequacy emergency in the PJM region."  Ex. 1 at 3 (emphasis added).  The evidence DOE cites is stale, overly general, or otherwise inapposite, including PJM's 2023 Energy Transition in PJM report ("2023 R4

---

[69] PJM Interconnection. 2025. *Hot Weather Operations: June 22–26, 2025.* Operating Committee. July 10, 2025 at 9 https://www.pjm.com/-/media/DotCom/committees-groups/committees/oc/2025/20250710/20250710-item-10---june-2025-hot-weather-update.pdf.

[70] PJM Interconnection, LLC, Final Loss of Load Analysis for Delivery Year 2025-26, https://www.pjm.com/-/media/DotCom/planning/res-adeq/elcc/253ia-info-for-loss-of-load-hours.xlsx (loss of load risk summed across days from August 28, 2025 (Hour Beginning 2112) and November 26, 2026 (Hour Beginning 4296), inclusive), and divided by total loss of load risk across all hours in the model.

Report")[71], PJM President Manu Asthana's March 2025 congressional testimony, the results of PJM's FERC-approved Reliability Resource Initiative ("RRI"), and NERC's 2024 Long-Term Resource Assessment.  In Public Interest Organization's Initial RFR, we explained why many of these references do not establish that an emergency within the meaning of that term in Section 202(c) exists.

As Public Interest Organizations previously noted, and DOE still has not addressed, PJM's Reliability Pricing Mechanism ("RPM") is the FERC-approved mechanism to ensure resource adequacy in the PJM Interconnection service territory.  *See* Ex. 8 at 17-21.  RPM's primary feature is a forward auction to procure commitments from generators, energy storage, and demand response, to meet anticipated load in a "delivery year," plus a reserve margin to account for the risk of generator outages.  The RPM auctions "clear" where the supply curve and administratively-determined demand curve cross; when supply is scarce or expensive, the auction will clear at a higher price, which signals to asset owners and investors that new entry is needed and that retirements should be delayed.

For the RPM delivery year encompassing the time period covered by both the Initial Order and the Renewed Order, the auction cleared sufficient capacity.[72] Specifically, the auction cleared 135,684 MW of unforced capacity, representing a

---

[71] PJM, Energy Transition in PJM: Resource Retirements, Replacements & Risks (Feb. 24, 2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[72] *See* PJM, 2025/2026 Base Residual Auction Report, at 3 (July 30, 2024) https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2025-2026/2025-2026-base-residual-auction-report.pdf.

18.6% reserve margin—0.8 percentage points higher than the target reserve margin of 17.8%.  Furthermore, those auction clearing results understated the amount of available capacity resources because they excluded two large reliability-must-run units in Maryland and 1,600 MW of accredited wind, solar and storage capacity.  *See* Ex. 8 at 57-58.

The capacity from Eddystone Units 3 and 4 was not offered into the auction for the ongoing delivery year, and nevertheless the auction cleared sufficient capacity to meet PJM's target procurement level (the "reliability requirement"), which reflects PJM's consideration of the risks the system faces during all hours of the year.  The Department's judgment that the PJM region needs additional resources (i.e., Eddystone Units 3 and 4)—notwithstanding PJM's resource adequacy mechanism meeting and even exceeding its own reliability target calculated pursuant to FERC-approved methodologies—reflects the Department's unlawful encroachment on FERC's authority regarding resource adequacy matters.

Furthermore, in July 2025, PJM's RPM again procured sufficient capacity to meet the region's Reliability Requirement for the 2026-2027 delivery year (which will begin on June 1, 2026).[73]  The most recent auction again cleared at high prices and included a 2,699 MW increase in new generation and generation uprates, which reversed a three-auction downward trend in the amount of new generation and

---

[73] *See* PJM, 2026/2027 Base Residual Auction Report (July 22, 2025), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2026-2027/2026-2027-bra-report.pdf.

generation uprates.[74] This demonstrates that FERC's approved mechanism for ensuring resource adequacy in PJM is working as designed to send price signals when capacity levels tighten to retain existing capacity resources and encourage the entry of new resources. Both the 2025/2026 and 2026/2027 auctions procured adequate capacity without the Eddystone Units, indicating that these units are surplus beyond what PJM proposed and FERC approved, as the level needed to maintain resource adequacy. The Renewed Order continues DOE's failure to mention these critical facts, which undermines its case for an emergency, and reflects arbitrary agency decision-making.

### i. PJM 2023 R4 Report

Public Interest Organizations explained in the Initial RFR why the stale 2023 R4 Report does not support that there is a Section 202(c) emergency. Ex. 8 at 42-63. Not only did the Department fail to acknowledge any of these points in the Renewed Order, the additional quotes the Department relies on from the 2023 R4 Report contradict its claim that there is a Section 202(c) emergency.

As Public Interest Organizations explained in the Initial RFR, the 2023 R4 Report describes only "increasing risk of reliability risk," Ex. 8 at 49, over a period of seven years. This falls far short of an emergency within the meaning of Section 202(c), which must be imminent and certain. Moreover, the 2023 R4 Report's assessment of risk was flawed, primarily for its failure to account for the operation of PJM's capacity market in ensuring resource adequacy by assuming that capacity

---

[74] *Id.* at 3.

prices would remain at their then-recent low levels even as reserve margins shrunk. The last two PJM capacity auctions, with historically high capacity prices convincing certain resources to not retire, have proven how flawed that assumption was. *See* RFR, Ex. 8 at 56-59.

Further, the new quotes the Renewed Order pulls from the 2023 R4 Report contract the claim that the alleged emergency meets the requirements of Section 202(c) of an emergency. A Section 202(c) emergency must be certain, but the Renewed Order recognizes that the 2023 R4 Report only found a "*potential* timing mismatch between resource retirements, load growth and the pace of new generation entry" *if* PJM experiences a "low new entry" scenario. Ex. 1 at 2 (citing 2023 R4 Report) (emphasis added). The "low new entry" scenario in PJM's 2023 R4 Report was conceptually invalid, as explained by economist James Wilson in a 2023 critique of that report, because it rested on an assumption that "capacity prices would remain at recent low levels even while reserve margins decline due to the fast pace of retirements and slow pace of new entry."[75] Mr. Wilson opined that "[t]hese assumptions—a fast pace of retirements, a slow pace of new entry, low reserve margins and low capacity prices—are simply contradictory and ignore the basic market dynamic that ensures resource adequacy in the PJM region."[76] Indeed, for Delivery Year 2026-27, when PJM's report predicted reserve margins would fall to

---

[75] James F. Wilson, Maintaining the PJM Region's Robust Reserve Margins, at 8 (May 2023), https://www.sierraclub.org/sites/www.sierraclub.org/files/2023-05/Wilson%20R4%20Report%20Critique%2005-02-23.pdf.

[76] *Id.*

15%,[77] the Base Residual Auction cleared at around a 19% reserve margin with prices at $329 per MW-day (nearly ten times the price artificially frozen in flawed analysis in the 2023 R4 Report).[78] Consistent with the economic theory that higher prices attract new entrants to the market—a dynamic ignored by PJM's 2023 R4 Report—the most recent auction cleared 2,669 MW of new generation and generation uprates, which was higher than the last auction and "reversed a three-[Base Residual Auction] downward trend in the amount of new generation and generation uprates."[79] This increase in prices, and the related increase in new entry, demonstrates the flaw in PJM's 2023 R4 Report, which inexplicably ignored how its own capacity market is designed to incentivize the entry of new resources, when needed, through higher prices.[80]

---

[77] *See* PJM, Energy Transition in PJM: Resource Retirements, Replacements & Risks 16, Table 1 (Feb. 24, 2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[78] *Compare* PJM, 2026/2027 Base Residual Auction Report, at 3, 5 tbl. 2, (July 22, 2025), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2026-2027/2026-2027-bra-report.pdf; *with* 2023 R4 Report at 10 (noting use throughout study period of 2023/2024 Base Residual Auction prices); *see also* PJM, 2023/2024 Base Residual Auction Results, at 1, https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.pdf (reporting prices in the unconstrained portions of PJM of approximately $34 per megawatt-day).

[79] PJM, 2026/2027 Base Residual Auction Report, at 3 (July 22, 2025), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2026-2027/2026-2027-bra-report.pdf.

[80] James F. Wilson, Maintaining the PJM Region's Robust Reserve Margins, at 8 (May 2023), https://www.sierraclub.org/sites/www.sierraclub.org/files/2023-05/Wilson%20R4%20Report%20Critique%2005-02-23.pdf.

The Renewed Order also contradicts DOE's claims that the situation in PJM has been unexpected by noting how "PJM has indeed voiced these concerns *for years*." Ex. 1 at 3 (emphasis added). A concern that has been discussed for more than two years is not unexpected. Finally, the Renewed Order also contradicts its claims that the alleged emergency is imminent by explaining how the 2023 R4 Report "determined that the pace of new capacity additions 'would be insufficient to keep up with expected retirements and demand growth *by 2030*.'" Ex. 1 at 3 (emphasis added). Simply, the stale and flawed 2023 R4 Report does not provide evidence that there is an emergency pursuant to Section 202(c).

## ii. March 2025 Asthana Testimony

As Public Interest Organizations explained in the Initial RFR, the primary focus of President Asthana's testimony was on how PJM has been preparing to meet resource adequacy challenges that PJM forecasts may emerge later in the decade. A full review of the testimony demonstrates the inappropriateness of Section 202(c) emergency action based on resource adequacy shortfalls that may arise in future years because PJM is already taking action through the standard processes.

The Renewed Order adds that Mr. Asthana noted that, "though various reforms instituted by PJM had succeeded in bringing new generation online and preventing the retirement of existing units, supply conditions within PJM are still *tightening*." Ex. 1 at 5 (emphasis added). The fact that conditions may be tightening is not evidence that an emergency under Section 202(c) currently exists; in fact, it suggests the opposite—that the supply conditions currently meet the demand now. Mr. Asthana's statement that the various reforms already

implemented within the existing market structure have been successful also points to the need to continue to let markets work as they are designed to both to retain some units and encourage new units to come online, not to interfere through a command-and-control mandate. As explained in Section V.C, below, the Department's misuse of its emergency authority under Section 202(c) will disrupt the competitive market processes that FERC and PJM have determined will best promote resource adequacy in the region.

### iii. Resource Reliability Initiative

The Renewed Order puts forth concerns from PJM about resource adequacy described in the December 2024 RRI filing. As Public Interest Organizations explained in the Initial RFR, the "possibility of a resource adequacy shortfall" identified in the RRI would only come to pass well after the 90-day period relevant to the Initial Order. Ex. 8 at 48-49. This remains true—the possibility identified in the RRI still will not come to pass in the 90 days relevant to the Renewed Order, or even until June 2027 at the earliest based on the adequate capacity PJM has procured in its RPM.

The Renewed Order focuses on the fact that "[a]lthough the RRI process will help expedite the construction of needed new capacity, it is unlikely to result in the addition of any new generation capacity in the next few years." Ex. 1 at 3-4. First, we repeat, there is no capacity shortfall in the next few years because PJM's RPM procured an adequate amount of capacity to meet the region's Reliability Requirement for the 2025-2026 and the 2026-2027 delivery years—meaning through June 2027—both without the Eddystone Units. Further, PJM explained

that the RRI will bring significant amounts of capacity "to the PJM markets before 2028, when PJM anticipates the resource adequacy issues will become more severe, and in advance of the 2030/31 delivery year, when PJM anticipates demand could begin outstripping supply." 190 FERC ¶ 61,084, at P 20 (citing PJM filing at 22). PJM designed the RRI to address the projections it has made about potential capacity shortfalls a few years from now because there is no imminent potential shortfall. As Public Interest Organizations explained in the Initial RFR, the Department's citation of an approved solution to a problem that would otherwise arise in several years does not constitute evidence of an imminent emergency as required for a Section 202(c) order. Finally, in approving the RRI, FERC found "that the proposal reasonably addresses the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry." 190 FERC ¶ 61,084, at P 14. The Department offers nothing to call into question FERC's conclusion.

### iv. NERC 2024 LTRA

The Renewed Order asserts that the "North American Electric Reliability Corporation (NERC) has raised similar concerns" as those that undergirded PJM's RRI filing. Ex. 1 at 4. DOE notes that NERC's 2024 Long Term Reliability Assessment explains that "PJM could face future resource adequacy challenges, impacting system reliability and PJM's ability to serve load."[81] What NERC further

---

[81] Ex. 1 at 4 (citing 2024 Long-Term Reliability Assessment, North American Electric Reliability Corporation ("NERC 2024 LTRA") at 92 (Dec. 2024),

explains, and which DOE omits, is that these risks arise only if the trends of slow

new resource entry continue.  NERC 2024 LTRA at 92.  Immediately thereafter,

NERC notes that PJM stakeholders are considering a new process to streamline

addition of capacity resources at existing points of interconnection, *id.* at 93, a

process that has now been approved by FERC, *PJM Interconnection LLC*, 190 FERC

61,083 (Feb. 11, 2025), and touted by PJM's CEO as an important part of how PJM

will meet resource adequacy needs in the coming years.[82]  NERC's report also

predated FERC approval of the RRI, which FERC agreed will expedite new entry of

resources that can contribute meaningfully to resource adequacy.[83]  Moreover,

another risk factor cited in the NERC report, retirement of existing resources, is

also not panning out as described.  *See* NERC 2024 LTRA at 93.  Since the

beginning of 2024, over 1200 MW of resources have voluntarily withdrawn

deactivation notices previously submitted to PJM,[84] and another 1,984 MWs have

---

https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_Long
%20Term%20Reliability%20Assessment_2024.pdf).

[82] PJM, U.S. House of Representatives Committee on Energy & Commerce,
Subcommittee on Energy, Testimony of Manu Asthana at 8-9 (March 25, 2025)
https://docs.house.gov/meetings/IF/IF03/20250325/118040/HHRG-119-IF03-Wstate-
AsthanaM-20250325.pdf.

[83] 190 FERC ¶ 61,084 (order accepting PJM revisions to RRI).

[84] PJM Generation Deactivations, "Withdrawn Deactivations" Tab (last
viewed Sept. 25, 2025), https://www.pjm.com/planning/service-requests/gen-
deactivations.

been retained through 2030 under Part V of PJM's tariff for local reliability needs while transmission upgrades are constructed.[85]

> b. *Possible data center load growth in the next five years does not constitute a near-term emergency*

The Renewed Order next relies on the assertion in the Department's July 2025 RAR that, "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation." Ex. 1 at 5 (citing Ex. 3 at 1). The Renewed Order describes the prolific growth of data centers in PJM by 2030, citing recent investor updates by major PJM utilities and the Department's own findings in the RAR that projected load growth, along with 17,000 MW of modeled thermal resource retirements, would result in "approximately 430.3 loss of load hours in an average weather year," and under the worst weather year assumptions, an estimated "1,052 loss of load hours and a max unserved load hours of approximately 21.335 GW." *Id.* (citing Ex.3 at 27-28).

The Renewed Order's discussion regarding data center load growth is irrelevant and unsubstantiated for three reasons.

First, the Renewed Order does not state that any of this unexpected load growth or projected loss of load will occur during the 90-day period of the Renewed Order—its analysis is specifically about what might happen by 2030. Section 202(c)

---

[85] *See* PJM Generation Deactivations, "Future Deactivations Tab" (last viewed Sept. 25, 2025), https://www.pjm.com/planning/service-requests/gen-deactivations (summing listed capacity of Wagner and Brandon Shores units).

does not give DOE the authority to retain generation units for possible conditions that might arise in five years. *See supra*, Section V.A. Authority to address longer-term threats to resource adequacy rests with FERC and states—all of whom are intensely focused on these issues and working productively with PJM to resolve them.[86] This includes not only working to accelerate interconnection and otherwise expedite new entry, but also to impose reasonable constraints on the load growth associated with data centers, in order to protect consumers.

Second, while the Renewed Order recites the RAR's estimates of loss of load hours and quantities for PJM under specific circumstances, it omits the Department's own acknowledgement in that same report that grid operators won't shed load under these circumstances. The RAR states that its analysis "is not an indication that reliability coordinators would allow this level of load growth to jeopardize the reliability of the system." Ex. 3 at 7. Its numbers are, rather, "indicators to determine where it may be beneficial to encourage increased generation and transmission capacity to meet an expected need." *Id*. The benefits of encouraging increased generation to meet projected future needs do not justify invocation of the Department's emergency powers under Section 202(c). And, in

---

[86] *See, e.g.,* Meeting the Challenge of Resource Adequacy in RTO/ISO Regions, FERC Docket No. AD25-7-000, https://www.ferc.gov/media/notice-ad25-7-000-tech-conf (notice of two-day technical conference followed by voluminous public comments); New Jersey Board of Public Utilities, Notice of Technical Conference on Resource Adequacy, July 31, 2025, https://www.nj.gov/bpu/newsroom/2025/approved/202507731.html; Notice of Multi-State Technical Conference, In the Matter of State Participation in PJM Interconnection and Governance Reform, https://mailchi.mp/gpisd/pjm-multi-state-technical-conference.

fact, the Department's mandates to maintain old resources under Section 202(c) are likely to interfere with rather than encourage new generation by mudding market signals and congesting transmission access. *See infra*, Section V.C.

Indeed, PJM Interconnection has recently proposed measures to address expected supply shortages associated with large load additions, to maintain its Reliability Requirement and ensure continued service to PJM native load. In cases where there is an expected supply shortage due to forecasted large loads that have not procured their own generation or are not willing to participate as demand response, PJM would require each load-serving entity to have a portion of its load—proportional to its forecasted large load additions—be curtailable at certain times of the year.[87] While still in early stages of development in the stakeholder process, this proposal demonstrates how grid operators like PJM will adapt to unexpected and uncertain surge in single large loads to preserve electric system reliability.

Third, the RAR's projections of loss of load in PJM in 2030 reflect inaccurate or unrealistic assumptions, such as unreasonably high resource retirement forecasts and unreasonably low rates of new entry of generation resources. Public Interest Organizations detailed these shortcomings in a Request for Rehearing of the RAR, filed with the Department on August 6, 2025, and attached here as Exhibit 13. In brief, the RAR acknowledges that its own resource adequacy analysis "could benefit

---

[87] PJM, Large Load Additions: PJM CIFP initial proposal and Alternatives considered 7 (Sept. 15, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/cifp-lla/2025/20250915/20250915-item-07---pjm-initial-proposal-and-alternatives-considered---pjm-presentation.pdf.

greatly from the in-depth engineering assessments which occur at the regional and utility level." Ex. 3 at i. DOE further explains that "[h]istorically, the nation's power system planners would have shared electric reliability information with DOE through mechanisms such as EIA-411, which has been discontinued." *Id.* These analytical and informational gaps, along with an apparent lack of internal peer review, raises fundamental questions about the extent to which any result or conclusion in the RAR can be relied upon. As experts from GridLab and NYU's Institute for Policy Integrity have highlighted,[88] DOE's resource retirement forecasts are inconstant with and exceed their own long-standing and heavily vetted data sources, and ignore recent economic trends that would tend to defer the retirement of existing resources. Put simply, it is illogical to assume that generation resource retirement decisions projected in one regulatory and economic environment will actually occur in a radically different environment where demand for generation is high and regulatory burdens are low.

The RAR exacerbates this problem by underestimating the amount of new resource entry. The RAR assumes that "only [generation] projects that are very mature in the pipeline (such as those with a signed interconnection agreement) will be built" by 2030. Ex. 3 at 12. DOE constrains the RAR's analysis to include only projects designated as Tier 1 in the NERC 2024 Long Term Resource Assessment. Because Tier 1 includes only resources that are already under construction, have

---

[88] *See* Ex. 14 and Ex. 15.

signed construction service agreements, or have similar characteristics,[89] this assumption "results in minimal capacity additions beyond 2026." Ex. 3 at A-5. As experts at GridLab observe, the assumption that "no projects are built post 2026, [] is not realistic for a report forecasting to 2030." Ex. 14 at 3. This is especially true given rising energy prices due to increased demand, which is attracting more investment to the market and driving new construction of generation resources. Researchers at Institute for Policy Integrity concluded that DOE departed from best practice in declining to include any resources classified by NERC as "Tier 2" resources in the overall resource adequacy analysis for 2030, even those at advanced stages of the interconnection process. *See* Ex. 15 at 23.

The Renewed Order fundamentally errs in relying upon potential data center load growth in the PJM region over the next five years to justify invoking emergency powers that Congress intended for imminent energy shortfalls. Even if such longer-term circumstances could justify a Section 202(c) order, the Department's evidence of any longer-term shortfalls relies upon a faulty report that acknowledges that the ability of the grid to accommodate data center load growth does not implicate reliability, but instead the growth of this new economic sector.

---

[89] *See* Ex. 15 at n.155 (citing NERC 2024 LTRA).

## C. The Renewed Order Will Undermine Competitive Markets to the Detriment of Consumers and Reliability.

When viewed together with the Energy Emergency EO,[90] Grid EO, and the Department's nearly identical 202(c) orders regarding the Campbell coal plant,[91] the Department advances an illegal command-and-control energy policy that effectively overrides the capacity and energy markets to force a private entity to continue operating an uneconomic unit they wished to decommission and for ratepayers to pick up the tab. Congress delegated to FERC the authority to regulate wholesale energy markets and interstate transmission and granted the Department only a narrow, backstop authority through Section 202(c). 16 U.S.C. § 824a(c). If left to stand, the Department's overbroad Renewed Order will continue to erode competitive markets for energy, leading to a system that will deliver less reliability to consumers at greater cost.

### 1. Competitive Markets Have a Long History of Success.

For nearly a century, FERC's core responsibility under the Federal Power Act has been to ensure that rates, terms, and conditions employed by utilities for wholesale energy sales and transmission are just, reasonable, and not unduly discriminatory. 16 U.S.C. § 824d ("Section 205"). While the initial utility structure was vertically integrated such that generation, transmission, and distribution

---

[90] Exec. Order No. 14,156 Declaring a National Energy Emergency, 90 Fed. Reg. 8,433 (Jan, 20, 2025).

[91] Ex. 16 at 1-2, DOE Order No. 202-25-3 (May 23, 2025) (directing dispatch of the Campbell plant, which was scheduled to cease operations the following week); Ex. 17, DOE Order No. 202-25-7 (Aug. 20, 2025); Ex. 18, DOE Order No. 202-25-3B (Sept. 8, 2025).

resources were all held by the same entity, advances in technology and statutory changes led to the development of energy markets and merchant generation.[92] Further regulation by FERC in the 1990s with Order Nos. 888, 890, and 2000 fostered the establishment of several independently operated RTOs, which set up competitive markets that determine the prices for energy, capacity, and ancillary services based on procurement and dispatch of least-cost resources.[93] As RTO markets expanded, many states deregulated their utility monopolies and required them to join RTOs. Generating resources in competitive RTOs are built and retired by private investors in response to market price signals designed to encourage new investment when supply is tight and to encourage the retirement of facilities that are no longer competitive when capacity is plentiful. RTOs now account for approximately 2/3 of all electricity sales in the United States and have

---

[92] *See, e.g., Order Terminating Rulemaking Proceeding, Initiating New Proceeding, And Establishing Additional Procedures*, 162 FERC ¶ 61,012, PP 7-11 (2018); *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,639-31,645 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[93] Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 638-41 (1996), Order No. 890, FERC Stats. & Regs. ¶ 31,241, at 124-352 (1997), Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 99-130 (1999).

saved consumers billions of dollars, increased reliability, and reduced environmental harm.[94]

As explained by FERC, its "support of competitive wholesale electricity markets has been grounded in the substantial and well-documented economic benefits that these markets provide to consumers."[95] In addition to billions of dollars of consumer savings, FERC found that competitive markets protect consumers by "providing more supply options, encouraging new entry and innovation, spurring deployment of new technologies, promoting demand response and energy efficiency, improving operating performance, exerting downward pressure on costs, and shifting risk away from consumers."[96]

---

[94] *See, e.g.*, Judy Chang et al., The Brattle Group, Potential Benefits of a Regional Wholesale Power Market to North Carolina's Electricity Customers, 1, 3-7 (April 2019), https://www.brattle.com/wp-content/uploads/2021/05/16092_nc_wholesale_power_market_whitepaper_april_2019_final.pdf (discussing billions of dollars in estimated cost saving); Jennifer Chen & Devin Hartman, *Why wholesale market benefits are not always apparent in customer bills*, R Street (Nov. 10, 2021), https://www.rstreet.org/commentary/why-wholesale-market-benefits-are-not-always-apparent-in-customer-bills/ (same); Jeff St. John, *A Western US energy market would boost clean energy. Will it happen?*, Canary Media (Jun. 10, 2024), https://www.canarymedia.com/articles/utilities/a-western-us-energy-market-would-boost-clean-energy.-will-it-happen; John Tsoukalis et al., Assessment of Potential Market Reforms for South Carolina's Electricity Sector, at 6, 46, 77-78 (Apr. 27, 2019), https://www.scstatehouse.gov/CommitteeInfo/ElectricityMarketReformMeasuresStudyCommittee/2022-04-27%20-%20SC%20Electricity%20Market%20Reform_Brattle%20Report.pdf (discussing cost savings across regional wholesale markets).

[95] Order Terminating Rulemaking Proceeding, Initiating New Proceeding, and Establishing Additional Procedures, 162 FERC ¶ 61,012, P 11 (2018).

[96] *Id.* (citation omitted).

As part of its role in regulating markets, FERC has implemented
Congressional mandates to ensure system reliability, including working with NERC
to set industry standards for grid reliability;[97] coordination requirements for the
natural gas and electricity market scheduling;[98] investigation and improvements
required in light of the grid's response to extreme weather events;[99] and reviewing
capacity accreditation processes to ensure that capacity markets generate reliable
results.[100]

---

[97] PJM, NERC and Reliability (Jan. 5, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/nerc-and-reliability-fact-sheet.pdf. *See also* PJM, PJM Ensures a Reliable Grid (Jan. 29, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/reliability-fact-sheet.pdf.

[98] PJM, PJM Promotes Gas/Electricity Industry Coordination (Jan. 29, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/gas-electric-coordination-fact-sheet.pdf.  *See also*, Order 787, 145 FERC ¶ 61,134 (2013); Order 809, 151 FERC ¶ 61,049 (2015).

[99] *See, e.g., Centralized Capacity Markets in Regional Transmission Organizations and Independent System Operators*, 149 FERC ¶ 61,145 (2014) (order addressing technical conferences on, among other things, the 2014 Polar Vortex); *Order Approving Extreme Cold Weather Reliability Standards EOP-011-3 and EOP-012-1 and Directing Modification of Reliability Standard EOP-012-1*, 182 FERC ¶ 61094 (2023);*Order Approving Extreme Cold Weather Reliability Standard EOP-012-2 and Directing Modification*, 187 FERC ¶ 61,204 (2024). *See also,* FERC, NERC and Regional Staff, Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott (Oct. 2023), https://www.ferc.gov/sites/default/files/2023-11/24_Winter-Storm_Elliot_1107_1300.pdf; FERC, NERC and Regional Staff, The February 2021 Cold Weather Outages in Texas and the South Central United States (Nov. 2021), https://www.nerc.com/pa/Stand/Project202107ExtremeColdWeatherDL/FERC%20Presentation-Phase%202.pdf; PJM, Winter Storm Elliott Event Analysis and Recommendation Report (2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io.

[100] *Id.*; *see also* Order Accepting Tariff Revisions Subject to Condition, 186 FERC ¶ 61,080 (2024).

2. Command and Control Orders Run Counter to Federal Power Act Requirements and Fundamental Market Principles.

Despite the decades of evidence that competitive energy markets deliver reliable energy at least cost to consumers, as well as the extensive and constant oversight of these markets by FERC, the Renewed Order operates under the implicit assumption that capacity market results are not reliable, and that market-driven generator retirement is cause for alarm. This is not the first time this President has sought to require preferential treatment for retiring resources he preferred for grid reliability.[101] When the Department proposed to have a rule that would require tariff provisions designed to prevent the retirement of preferred resources, FERC rejected the proposal unanimously.[102] FERC found that the allegations that potential retirements of particular resources would lead to grid reliability problems did not demonstrate that existing rules were unjust and unreasonable.[103] Nor was there evidence from the RTOs that any particular generator retirement would be a threat to grid resilience.[104] Moreover, FERC found that the proposal to pay cost-of-service rates for only certain types of resources

---

[101] *See, e.g.,* Casey Roberts, *FERC Rejects DOE's Dangerous Proposal to Shield Coal and Nuclear From Clean Energy Competition*, Sierra Club (Jan. 9, 2018), https://www.sierraclub.org/compass/2018/01/ferc-doe-coal-nukes-perry-subsidies

[102] Order Terminating Rulemaking Proceeding, Initiating New Proceeding, and Establishing Additional Procedures, 162 FERC ¶ 61,012 (2018).

[103] *Id.* at PP 15-16.

[104] *Id.*

"regardless of need or cost to the system" would not be just and reasonable, or not unduly discriminatory.[105]

Similar to this prior effort, the Renewed Order proposes to force the Eddystone Units to run regardless of need or cost to the system. The Renewed Order demands that PJM "take every step to employ economic dispatch," which it fails to define. Ex. 1 at 3. As discussed in Public Interest Organization's Initial RFR, Ex. 8, section IV., PJM dispatches generators based on the lowest marginal price, respecting transmission constraints. The low historic utilization of Eddystone reflects that its costs to operate are so much higher than alternative resources that it isn't being dispatched enough of the time—even during times of peak load—to warrant keeping the unit online. *See supra*, Section IV.B. Constellation was well aware of PJM's load forecasts and the related high capacity prices when it opted to retire the Eddystone Units. This indicates that Constellation either didn't see Eddystone becoming economic even in future scenarios and/or that it felt it could make more money by retiring the Eddystone Units and investing in other options that offered the ability to dispatch more frequently and earn a greater return on investment. Moreover, Constellation had a year and a half between announcing the planned retirement of Eddystone and the planned retirement date to change its mind. The fact that Constellation remained committed to retiring Eddystone regardless of the increasing capacity prices over that time is even stronger evidence of Constellation's conclusion that keeping Eddystone online would not be worth it.

---

[105] *Id.* at P 16.

By forcing Eddystone to stay on the system despite this, the Department will raise prices for consumers by forcing them to pay for a resource that is unnecessary to meet PJM's Reliability Requirement for the current delivery year. Keeping Eddystone online also forces Constellation to continue to invest its money in an aging and expensive unit instead of investing in newer, more profitable units.

Should the Renewed Order continue to be extended, as the Department suggests it will be, the consequences will become further reaching. Mandating that Eddystone remain online over a longer timeline forces PJM and Constellation to tie up the transmission capacity rights owned by the Eddystone Units that could otherwise be repurposed by Constellation for a new unit at the Eddystone site or put back into the system for allotment to new, cheaper, more efficient and reliable resources waiting in PJM's infamously years-delayed interconnection queue.[106] In other words, the Order forces Constellation to tie up an incredibly valuable transmission resource by maintaining that transmission headroom for a resource that is no longer useful and is unlikely to actually need to be used. As such, this decision is the very opposite of the bedrock principle of utility law that asset

---

[106] Joseph Rand et. al., Queued Up: 2024 Edition, *Lawrence Berkeley National Laboratory* (April 2024) at 35,https://emp.lbl.gov/sites/default/files/2024-04/Queued%20Up%202024%20Edition_R2.pdf (showing that PJM has the longest queue processing timelines in the U.S.); Synapse Energy Economics, Inc., Sabine Chavin et al., Tackling the PJM Electricity Cost Crisis (Apr. 2025), https://www.synapse-energy.com/sites/default/files/Evergreen%20PJM%20Queue%20Report%204.10.25_%20final%2024-145.pdf; Grid Strategies, Generator Interconnection Scorecard (Feb. 2024) https://gridstrategiesllc.com/wp-content/uploads/2024/03/AEI-2024-Generation-Interconnection-Scorecard.pdf (scoring PJM's overall interconnection a D-).

expenditures must be used and useful.[107]  Moreover, it defeats the Administration's alleged concern that there are more retirements than new resources coming on the system.  Ex. 1 at 1.  As mentioned above, PJM has instituted new procedures for allowing resources needed for reliability to advance to the front of the interconnection queue.  By tying up transmission capacity at the Eddystone Units, it also prevents new, more affordable and reliable resources already waiting to replace it from doing so.

Finally, the longer-term impacts of the Department's strategy send signals that will disrupt market stability.  Markets ultimately still depend on private investors, who will be less likely to invest billions of dollars in an energy system run according to personal whim rather than on market forces.  The need for market stability across administrations and department heads is why Congress deliberately placed the authority for utility regulation—a matter so fundamentally central to the entire economy and well-being of the nation—in the hands of independent regulators with specialized expertise and only allowed the Department to intervene in true emergencies.[108]  As noted by former FERC Commissioner Brownell, to do otherwise would "have a chilling effect on markets because investors will be unlikely to risk hundreds of billions of dollars on investments regulated by

---

[107] *See* FERC, Energy Primer, at 55 (2024), https://www.ferc.gov/sites/default/files/2024-01/24_Energy-Markets-Primer_0117_DIGITAL_0.pdf; Jim Lazar, Electricity Regulation in the US: A Guide, Second Edition, at 91 (2016), https://www.raponline.org/wp-content/uploads/2023/09/rap-lazar-electricity-regulation-US-june-2016.pd.

[108] *See generally*, Patrick M. Corrigan & Richard L. Revesz, *The Genesis of Independent Agencies*, 92 N.Y.U. L. Rev. 637 (2017).

politically influenced non-transparent decisions."[109]  In usurping the role of FERC and RTO markets to regulate the energy markets so that the Department can prioritize resources it favors and thwart the development of those it dislikes, the ultimate message is for private investors not to invest.

### D. The Terms of the Renewed Order Do Not Best Meet the Claimed Emergency or Serve the Public Interest

1. Section 202(c)(1) Only Authorizes the Department to Require Generation that Best Meets the Emergency and Serves the Public Interest.

Even if there were a Section 202(c) emergency, which as shown above there is not, Section 202(c)(1) requires the Department only impose requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest."  16 U.S.C. § 824a(c)(1).  The Department therefore must consider alternatives and choose the alternative that is most advantageous to meeting the emergency and serving the public interest as defined by the Federal Power Act.

The term "best" demands a comparative judgment that there are no better alternatives.  The word "best" is inherently a comparative term and means "that which is 'most advantageous.'"  *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (quoting Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra*

---

[109] Herman K. Trabish, *Trump executive order threatens transmission, interconnection initiatives: former FERC commissioners*, Utility Dive (Mar. 26, 2025), https://www.utilitydive.com/news/trump-executive-order-agency-independence-ferc-transmission-interconnection-initiatives/742356/. *See also* Oskar Dye-Furstenberg, *The Hollow Energy Agenda of Trump's First Four Months*, Roosevelt Institute (May 29, 2025), https://rooseveltinstitute.org/blog/the-hollow-energy-agenda-of-trump/.

*Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved). Consequently, the Department must, at minimum, consider alternatives and evaluate whether and to what extent a given alternative addresses the alleged emergency and serves the public interest, including deficiencies associated with each option.

Moreover, the Department must consider alternatives as part of exercising reasoned decision-making. It need not consider every conceivable alternative, but it must consider alternatives within the ambit of the existing policy as well as alternatives which are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (failure to consider alternative was arbitrary and capricious); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (must consider alternatives "within the ambit of the existing standard"); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("agency must consider and explain its rejection of reasonably obvious alternatives" (cleaned up)).

Public Interest Organizations introduced several alternatives in their Initial RFR, Ex. 8 at 74-76, and the Department had no excuse not to address these alternatives in its Renewed Order. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (holding that agency's failure to consider the disclosure alternative raised by dissenting Commissioners and

introduced by commenters violated the Administrative Procedure Act); *cf.* 10 C.F.R. § 205.370 (stating the Department's right "to cancel, modify, or otherwise change" an order). The Department has had ample time to consider alternatives in the 90 days since it issued the Initial Order. There was no period of mere hours that would have permitted a more abbreviated consideration of alternatives. 16 U.S.C. § 824a(c) (directing the Department to exercise its judgment). The Department in fact suggested in the Initial Order that it planned to "further evaluate" Eddystone. Initial Order at 2.[110] But the Renewed Order provides no evidence that any such analysis or evaluation of any additional alternatives was conducted since issuance of the Initial Order.

Moreover, some alternatives that the Department could have considered are listed in the Department's own regulations and past orders. The regulations specify information the Department shall consider in deciding to issue an order under Section 202(c), and require an applicant for a 202(c) order to provide the information. 10 C.F.R. § 205.373. The specified information includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," 10 C.F.R. § 205.373(g)–(h), and "available imports, demand response, and

---

[110] PJM also seemed to support the Initial Order as a "prudent, *term-limited step*" in order to "allow DOE, Constellation Energy and PJM to undertake further analysis regarding the longer-term need and viability of these generators." Ethan Howland, UtilityDive, *DOE orders Constellation to delay retiring 760 MW to ease PJM 'emergency'* (June 2, 2025), https://www.utilitydive.com/news/doe-constellation-pjm-emergency-eddystone/749520/ (emphasis added).

identified behind-the-meter generation resources selected to minimize an increase in emissions." Ex. 10 at 4.

The statutory command to take only measures that serve the public interest further constrains the Department's authority. The public interest element demands that the Department advance, or at least consider, the various policies of the Federal Power Act. *Cf. Wabash Valley Power Ass'n*, 268 F.3d at 1115 (interpreting the "consistent with the public interest" standard in Section 203 of the Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973) (discussing "public interest" standard in other provisions); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962). Primary policies of the Federal Power Act include protecting consumers against excessive prices; maintaining competition to the maximum extent possible consistent with the public interest; and encouraging the orderly development of plentiful supplies of electricity at reasonable prices. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) (orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) (excessive prices). And because Section 202(c) expressly protects environmental considerations, these are part of the public interest element too. *See NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . take meaning from the purposes of the regulatory legislation.").

2. The Renewed Order Does Not Contain a Reasoned Basis that Eddystone Best Meets the Claimed Emergency and Serves the Public Interest.

Even if the scenario the Renewed Order lays out were an emergency pursuant to Section 202(c), the Department has not explained why ordering Eddystone to be available to operate is the best means to meet that scenario.  Ex. 1 at 1 & n.2

The operational status of Eddystone indicates that it is unable to meet purported emergencies.  Although a spokesperson for Constellation indicated back in June 2025 that the units were in "ready" status, that statement also indicated a need to take steps to "retain necessary staff and perform necessary maintenance to allow for safe and reliable operations."[111]  And while the Eddystone Units have run occasionally, Unit 4 "went offline" on June 23,[112] and on July 28 "was dispatched but unable to operate due to a tube leak."[113]  These problems indicate how these old, ready-to-retire Units are themselves unlikely to be reliable.  DOE's ongoing lack of certainty about the condition of the Eddystone Units is reflected in the Renewed Order, which seeks further information from PJM, by September 12, 2025,

---

[111] Jon Hurdle, *Aging Pennsylvania power plant to keep running after Trump order on eve of shutdown*, Pennsylvania Capital-Star (June 9, 2025), https://penncapital-star.com/energy-environment/aging-pennsylvania-power-plant-to-keep-running-after-trump-order-on-eve-of-shutdown/.

[112] PJM Interconnection, LLC, Compliance Report (June 24, 2025), https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250624-doe-compliance-report-for-eddystone-units-3-and-4.pdf.

[113] PJM Interconnection, LLC, Compliance Report (July 29, 2025) https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250729-pjm-report-in-compliance-with-ordering-para-b-of-doe-20250530-order-no-202-25-4.pdf.

"concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with this Order." Ex. 1 at 7, Paragraph D.[114]

Moreover, the Renewed Order also does not address readily available and obvious alternatives which, in point of fact, would better compensate for the supposed "resource adequacy issues" asserted (inaccurately) by the Renewed Order, and which Public Interest Organizations identified in their Initial RFR. Ex. 1 at 1, Ex. 8 at 74-76. PJM's own summer outlook predicts that even in the case of an all-time peak load, PJM would be able to meet its required reserve needs through its existing programs.[115] PJM has already contracted demand response programs—a lower cost means to address grid reliability concerns—that can meet even a record-high summer demand peak this year and will continue to be available, and even expanded, in the coming years.[116] Additionally, Public Interest Organizations highlighted in the Initial RFR the robust transmission connectivity between PJM and neighboring regions, which PJM has accessed on a regular basis to support the

---

[114] As of the date of this filing, PJM has not publicly posted any information shared with DOE pursuant to this paragraph.

[115] *See* Summer Outlook 2025, *supra* n. 37.

[116] *Id.* Commissioner Chang commended PJM's use of demand response in the June 23-26 heatwave. FERC Commission Meeting, June 2025 Open Meeting, https://youtu.be/eAHyYMKI_Yg ("In particular, I do want to highlight the PJM's use of nearly 4,000 MW of demand response to reduce the peak load, their peak load, on Tuesday from what would have been the third highest peak load experienced on the PJM system. I see load flexibility as a key tool for grid operators to meet the challenges that we face and I commend PJM for the successful use of demand response during the system strain.").

stability of its grid. *See* Ex. 8, Section IV.B. Failing to consider this option is inconsistent with the Department's long-standing recognition that power pools and utility coordination "are a basic element in resolving electric energy shortages." 46 Fed. Reg. at 39,985–86. The Department offers no reasonable basis to question the availability of resources from neighboring regions. But even if there were some barrier to transmission from those regions, the Department has not (and likely could not) explain why the Renewed Order provides a better means of ensuring resource sufficiency than addressing those barriers directly through its power to require "interchange" and "transmission" of electric energy from those neighboring regions. 16 U.S.C. § 824a(c)(1). Finally, even if preventing the retirement of existing facilities was the best means of addressing the alleged emergency, the Renewed Order does not address why maintaining the Eddystone Units over other retiring units is the best means. Buchanan Units 1 and 2 retired July 2, 2025.[117] These more modern combustion turbines, with a combined name plate generation of 88 MW, were constructed in 2002. Not only are these units newer than Eddystone, but their recent annual generation has been at least six times as much GWh and the plant has run almost twice as efficiently.[118]

---

[117] *See* PJM Generation Deactivations, "Deactivated Generators" Tab (last viewed Sept. 16, 2025) https://www.pjm.com/planning/service-requests/gen-deactivations; *see also* Letter from Jason P. Connel, VP Planning, PJM to Nathan Dixon, VP Buchanan Generation, LLC, *Deactivation Notice for Buchanan Unit 1 & Unit 2* (May 30, 2025) https://www.pjm.com/-/media/DotCom/planning/gen-retire/deactivation-notices/buchanan-unit-1-unit-2-pjm-response.pdf.

[118] *See* U.S. Energy Information Administration., Form EIA-923: Power Plant Operations Report (2023), https://www.eia.gov/electricity/data/eia923/.

The Renewed Order failed to include any consideration of these other alternatives. And the Order contains no reasoning demonstrating why Eddystone is the best alternative, or a better alternative than other options. As such, the Order is unlawful.

### E. The Terms of the Renewed Order Exceed Other Limits on the Department's Statutory Jurisdiction

1. The Department Lacks Jurisdiction to Impose Availability Requirements.

In directing PJM and Constellation Energy to take "all measures" to ensure that Eddystone is "available to operate," Ex. 1 at 6, the Department exceeded its authority under Section 202(c) of the Federal Power Act and impermissibly intruded on the authority over generating facilities that Section 201(b) of the statute reserves to the states, 16 U.S.C. §§ 824(b)(1), 824a(c)(1). The sweeping language in the Department's Renewed Order would encompass physical and all other changes necessary to revive a generating plant undergoing closure pursuant to a state-approved retirement process. The Federal Power Act's language, structure, legislative history, and interpretation by the courts all confirm that the Renewed Order is unlawful.

The structure and language of the Federal Power Act reflect Congress's deliberate choices to preserve the states' traditional authority over generating facilities and to circumscribe the Department's emergency authority in light of the states' role. The first sentence of the Federal Power Act declares that federal regulation extends "only to those matters which are not subject to regulation by the States." *Id.* § 824(a). Section 201(b)(1) states that, except as otherwise "specifically"

provided, federal jurisdiction does not attach to "facilities used for the generation of electric energy." *Id.* § 824(b)(1). The courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities. *See, e.g.*, *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (under Section 201(b), states retain the right "to require the retirement of existing generators" or to take any other action in their "role as regulators of generation facilities."). Congress also recognized the states' exclusive authority over generating facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes." 16 U.S.C. § 824a(b).

There is a clear distinction between authority to regulate generation facilities and the Department's authority under Section 202(c) to require generation of electric energy. Electric energy is an electromagnetic wave, and its "generation, delivery, interchange, and transmission" is the creation and propagation of that wave. *See* Brief Amicus Curiae of Electrical Engineers, Energy Economists and Physicists in Support of Respondents at 2, *New York v. FERC*, 535 U.S. 1 (2002); *see also* Edison Electric Institute Glossary of Electric Utility Terms (1991 ed.) (defining electric generation as "the act or process of transforming other forms of energy into electric energy"). Section 202(c)(1), like the rest of the Federal Power Act, is written "in the technical language of the electric art" and federal jurisdiction generally "follow[s] the flow of electric energy, an engineering and scientific, rather

than a legalistic or governmental test." *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 529 (1945); *see also Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972).

The scope of the Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear intention and repeated direction in the Federal Power Act to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to require just two specific things: (1) "temporary connections of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy." *Id.* § 824a(c)(1). The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause only authorizes connections "of" facilities; it does not provide authority to regulate the facilities. The differences in Congress's word choice in these clauses—referencing "facilities" in one authorizing provision but not the other—must be given effect. *See, e.g., Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority over generating facilities in Section 202(c)(1), it would have done so explicitly. Instead, the provision conspicuously excludes authority to manage the physical characteristics of power plants. Congress purposely limited and particularized the Department's

emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1).  *See* S. Rep. No. 74-621, at 19 (explaining that the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity"); *compare* S. 1725, Cong. Tit. II § 203(a) (providing in original, unenacted bill that control of the production and transmission of electric energy "except in time of war or other emergency declared to exist by proclamation of the President, shall, as far as practicable, be by voluntary coordination"), *with* 16 U.S.C. § 824a(c)(1) (providing particularized, specific authorities and circumstances in which the authorities may be exercised).

    The Department may require generation of electric power, and a utility may properly take steps at the facility to produce the power.  It is commonplace in the electric sector for the federal regulator properly acting within its authority to cause effects in a state regulator's jurisdictional sphere, and vice versa.  *See Elec. Power Supply Ass'n*, 577 U.S. at 281.  But the federal regulator may neither directly regulate generation facilities nor impose requirements aimed at the facilities, even if nominally regulating within its sphere.  *See id.* at 281–82; *see also Hughes*, 578 U.S. at 164–65. Such encroachment is impermissible, even in a real emergency and even more so in a wrongly claimed one.  *See Conn. Light & Power*, 324 U.S. at 530 ("Congress is acutely aware of the existence and vitality of these state governments. It sometimes is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed.").  Thus, the Department may not require generation that necessitates the utility taking steps reserved to

state authority, such as building a new generating unit or refurbishing a broken one.

Congress did not give the Department sweeping authority to order "all measures" needed to make a generation facility "available to operate." Nowhere does the statute empower the Department to order "all" steps that may be needed to resuscitate Eddystone, which could include repairs or modifications to physical facilities and other measures going far beyond electric power generation. Because the plant is at the end of its useful life, with years of forgone maintenance and investment, rendering it capable of meeting a short-term supply shortfall could essentially require rebuilding significant parts of the plant. On its face, the Department's Renewed Order is ultra vires. The Renewed Order therefore is unlawful and should be withdrawn.

> ### 2. The Department Lacks Jurisdiction to Disallow Treatment of Eddystone as a Capacity Resource.

The Renewed Order, unlike the Initial Order, includes an explicit provision that "the Eddystone Units shall not be considered capacity resources," "[b]ecause this order is predicated on the shortage of facilities for generation of electric energy and other causes." Ex. 1 at 7. This provision serves only to increase costs to customers, who will be required to procure duplicative capacity as a result. It is also illegal. Section 202(c) only authorizes the Commission to "require by order . . . temporary connections of facilities and . . . generation, delivery, interchange, or transmission of electric energy." 16 U.S.C. §§ 824a(c)(1), (3). Whether a generator is "considered" a capacity resource in the PJM region is determined by PJM's

FERC-approved resource adequacy rules; nowhere does the Federal Power Act suggest that the Department may predetermine or override the reasoned decisions of FERC in its determination of whether just and reasonable wholesale rates require an operating resource to be considered a capacity resource. Indeed, the very nature of 202(c) orders, which are limited to emergencies involving extant resource shortfalls (in which, by definition, there are no alternative capacity resources that might be displaced by the ordered generation) suggests that capacity resource treatment is well outside the Department's 202(c) authorities.

The Renewed Order suggests that because DOE finds there is a shortage of capacity resources, the Eddystone Units shall not be considered such resources; this reveals that DOE's true intent here is not to ensure that there are adequate capacity resources, but instead to force Eddystone to continue operating, without regard to the cost on consumers. PJM's Reliability Assurance Agreement ("RAA") defines a "capacity resource" as any of several types of resources "that are or will be committed to . . . satisfy the reliability requirements of the PJM Region, for a Delivery Year." PJM RAA Article 1, "Capacity Resources."[119] The Reliability Assurance Agreement and Open Access Transmission Tariff also establish clear procedures for calculating capacity contribution from all resources. Open Access Transmission Tariff Attachment DD, Section 5.6(e) (defining amount of unforced capacity that can be included in sell offers;[120] RAA Schedule 9.2 (setting out

---

[119] Available at https://agreements.pjm.com/raa/4102.

[120] Available at https://agreements.pjm.com/oatt/3897.

methodology for calculating effective load carrying capability—a key input to a capacity resource's unforced capacity value). PJM's FERC-approved tariff also includes comprehensive and detailed rules requiring various resources to offer into capacity auctions, to prevent exercises of market power through economic withholding. OATT Attachment DD.6.4 & DD.6.4A. Thus, the Renewed Order's elimination of capacity treatment for Eddystone bans PJM and any load-serving entity from accounting for the continued operation of Eddystone in its resource adequacy planning, in violation of PJM's FERC-approved tariff and despite the Department's apparent intention to force Eddystone to remain operational indefinitely. FERC has repeatedly, and very recently in the case of PJM, determined that resources retained through cost-of-service mechanisms for reliability purposes should be accounted for when an RTO procures capacity resources, lest consumers be stuck paying for redundant capacity and pay prices higher than necessary.

This is a significant and improper intrusion into FERC's oversight authority to ensure that RTOs, like PJM, justly and reasonably ensure resource adequacy in their footprint; in particular it undermines years of FERC's regulatory oversight of PJM's resource adequacy construct. It is within FERC's purview under Section 205 of the Federal Power Act to provide that oversight, 16 U.S.C. § 824d; and it is within PJM's purview to decide whether Eddystone should qualify as a "Capacity Resource" within PJM's FERC-approved resource adequacy construct. 18 C.F.R. § 35.1(e) ("No public utility shall [...] impose any classification, practice, rule, [or]

regulation […] which is different from that provided in a rate schedule required to be on file with [FERC] unless otherwise specifically provided by order of [FERC] for *good cause shown*.") (emphasis added).

The Department's intrusion into the oversight relationship between FERC and the RTOs also runs afoul of the filed rate doctrine, which holds that "no change shall be made in any [approved] rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public" in another filing with FERC. 16 U.S.C. § 824d(d); *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021). Interference in PJM's capacity auction rules for which resources qualify as capacity effectuates a *de facto* change to its tariff, without the legally required notice. And more generally, "Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. . . . governed in the first instance by business judgment and not regulatory coercion." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973). The Department's interference here in the core operational procedures of PJM's resource adequacy construct improperly upends that relationship.

Furthermore, the unavoidable implication of the Renewed Order not allowing PJM to include Eddystone as a capacity resource is that the Department believes PJM will likely secure the resources it determines are needed to maintain resource adequacy even without Eddystone: the provision would be unnecessary if PJM truly had no alternatives. And that means that either 1) the Department does not trust

PJM's assessment of PJM's resource adequacy; or 2) the Department does not trust its own assessment of PJM's resource adequacy.

In either case, the Department's actions are improper. The Renewed Order provides no evidence that PJM cannot be trusted to ensure resource adequacy, so a Department determination that PJM cannot be trusted would be arbitrary and capricious. It would also conflict with the Department's heavy reliance on PJM's statements and studies in support of its assertion that the region faces an emergency in the first place. Conversely, if the Department does not have the confidence that its own dire predictions that the system does not have enough resources will come true, then it is well short of the confidence necessary for an emergency declaration under Section 202(c).

If left unchecked, this provision will impose completely avoidable cost increases on PJM's ratepayers. The Eddystone Units would be unable to submit a sell offer for capacity in one of the RPM incremental auctions for the 2026-2027 delivery year, and to offer into the next Base Residual Auction (should the Order continue to be renewed, as Public Interest Organizations expect based on the Department's conduct thus far). Not only will this prohibition make PJM's resource adequacy picture appear more constrained than it actually is (thus serving the Department's false narrative), but it will also increase the financial cost of the Renewed Order in two ways. First, it will remove a potential income stream that might have offset Eddystone's operational costs, and second it will force PJM

consumers to pay higher prices for capacity by constraining supply in the auction and driving prices closer to the auction price cap.

In short, including this provision is yet another way in which the Department has misapplied the statute: by ensuring that Eddystone's principal impact will not be to plug a gap but rather to sabotage PJM's resource adequacy construct and intrude upon FERC's authority to establish just and reasonable rates for the same.

### F. The Renewed Order Fails to Provide the Conditions Necessary to Override Environmental Standards Under Section 202(c)(2).

Where an order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, Section 202(c)(2) requires the Department to "ensure:" (1) that the order compels "generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest;" (2) that operations are "to the maximum extent practicable . . . consistent with any applicable Federal, State or local environmental laws;" and (3) that it minimizes any adverse environmental impact, regardless of the facility's compliance (or non-compliance) with environmental standards. 16 U.S.C § 824a(c)(2).  And before renewing or reissuing such an order, the Department must (4) "consult with the primary Federal agency with expertise in the environmental interest protected by such law or regulation, and shall include in any such renewed or reissued order such conditions as such Federal agency deems necessary to minimize any adverse environmental impacts to the extent practicable," which conditions "shall be made available to the public."  16 U.S.C. § 824a(c)(4)(B).  The Renewed Order violates those statutory obligations.

### 1. The Renewed Order May Result in a Conflict with Federal, State, or Local Environmental Law or Regulation.

Section 202(c)(2) imposes mandatory duties on the Department if a 202(c) order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation." 16 U.S.C. § 824a(c)(2). The word "may" in this context denotes a mere possibility, not a certainty. This is especially apparent when matched against the term "shall" used in section 202(c)(2). 16 U.S.C. § 824a(c)(2). Congress' use of the two disparate terms must be given effect. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discussing significance of the words "may" and "shall" in the same statutory provision). Moreover, the results need not reach the level of "noncompliance" or "violation" of environmental law, both of which are terms Congress also used in other provisions to section 202(c). A possible "conflict" suffices. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (explaining that courts find "conflict" in the preemption context where, for instance, a law or order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

Taking "may" and "conflict" together, the upshot is that anytime the Secretary's order causes circumstances that might obstruct the accomplishment or execution of environmental laws or regulations, the Department must comply with Section 202(c)(2) duties. Congress's approach makes sense for a provision meant for responding to emergency situations. Congress was well aware of environmental issues stemming from 202(c) orders when it imposed the requirements in

97

section 202(c)(2).  *See, e.g.*, Rolsma, 57 Conn. L. Rev. at 807–09 (discussing prior incidents of tension between environmental requirements and responses to emergencies on the grid, and congressional hearings addressing the matter as part of the passage of section 202(c)(2)).  Congress struck a reasonable balance so that environmental concerns are not left by the wayside while allowing the Department to respond to actual emergencies.  Rather than requiring the Department to engage in a probing review of environmental permits at all levels of our federalist system before acting, Congress set a low threshold for imposition of the mandatory duties.  And as discussed in the next section, the congressionally-imposed duties allow the Department to act while also limiting that authority to only what is necessary to meet the emergency, again reflecting Congress's regard for environmental concerns even in an emergency.

The Department explicitly acknowledged that the Initial Order may result in a conflict with environmental requirements.  Ex. 2 at 2.  The Renewed Order is silent on that issue but says nothing to indicate that the Department has backed away from that conclusion, and says nothing that would allow it to do so.  Indeed, the Department implicitly acknowledges the possible conflict; the Renewed Order is limited to a 90-day duration.  Ex. 1 at 6-7.  That temporal limitation exists for a 202(c) order that may result in a conflict with environmental requirements.  16 U.S.C. § 824a(c)(4).  And in imposing the 90-day duration, the Department relies on the statutory limitation for an order that may result in a conflict with environmental requirements.  Ex. 1 at 6 n.38 (citing 16 U.S.C. § 824a(c)(4)).

Because the Renewed Order may conflict with environmental laws, the Department had the obligation under Section 202(c)(2) to include certain conditions in the Renewed Order, 16 U.S.C. § 824a(c)(2), and it did not fulfill that obligation.

### 2. The Renewed Order Lacks the Conditions Required by Section 202(c)

#### a. *The Terms of the Renewed Order Fail to Require Generation Only During Hours Necessary to Meet the Purported Emergency*

The Renewed Order directly contradicts the Department's obligation to require generation "only during hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(2). The Renewed Order instead states: "For the duration of this Order, PJM is directed to take every step *to employ economic dispatch* of the Eddystone Units to minimize cost to ratepayers." Ex. 1 at 6 (emphasis added). The "emergency" nominally described by the Renewed Order is "the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages." *Id.* Even if the Department had substantiated that emergency (which it has not), the Federal Power Act would allow the Department to compel generation only when such losses would occur absent operation of Eddystone. 16 U.S.C. 824a(c)(2); *see, e.g.,* Ex. 19 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by Department). "Economic dispatch," in sharp contrast, requires "the lowest-cost resources [to] run first," in pursuit of "the lowest-cost energy available." *City of New Orleans v. FERC*, 67 F.3d 947, 948–49 (D.C. Cir. 1995); *see also Fla. Power & Light Co. v. FERC*, 88 F.3d 1239, 1241 (D.C. Cir. 1996)

(noting distinction between economic dispatch and reserve capacity rules).  By instructing PJM to pursue economic dispatch, the Renewed Order's terms permit (indeed, direct) operation of Eddystone even when other—albeit higher cost— resources are available that would prevent any "curtailments or outages"—that is, the claimed emergency.  Ex. 1 at 6.  The Renewed Order's further instructions— limiting "dispatched units to the times and within the parameters as determined by PJM pursuant to paragraph A," *id.*—just repeats that initial instruction to "employ economic dispatch, without any further limitation that would "ensure" that generation occurs "only during hours necessary to meet the emergency" described by the Renewed Order.  16 U.S.C. § 824a(c)(2).  As such, the Renewed Order's terms fail to require operation "only during the hours necessary to meet the emergency" described by the Renewed Order and violate Section 202(c)(2).  16 U.S.C. § 824a(c)(2).

> b. *The Renewed Order Fails to Ensure Maximum Practical Compliance with Environmental Rules and Minimize Adverse Environmental Impacts*

The Renewed Order further fails to "ensure" that Eddystone operates, "to the maximum extent practicable," in conformity with applicable environmental rules. *Id.* The Renewed Order paraphrases the statutory text—that "operation of the Eddystone Units must comply with applicable environmental requirements . . . to the maximum extent feasible," but fails to specify who bears that responsibility or what such operation entails.  Ex. 1 at 7.  It imposes no further conditions beyond requiring Constellation to "pay fees or purchase offsets or allowances for emissions." *Id.* The direction to "comply . . . to the maximum extent feasible" is, as a result,

wholly unenforceable; the Renewed Order provides no basis for the Department, or anyone else, to determine whether the plant is in fact complying or who might face the consequences of any failure to do so. *See* Ex. 10 at 5–6 (DOE Order No. 202-22-4) (requiring, inter alia, reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators met requirement to comply with environmental requirements to maximum extent feasible). As such, the Renewed Order does not meet the Department's statutory obligation to "ensure" the maximum feasible compliance with applicable environmental standards—an obligation that requires the Department to offer some discrete guidance as to the plant's operations, rather than merely parroting the statutory text. 16 U.S.C. § 824a(c)(2) (emphasis added).

In addition, the Renewed Order fails to "minimize[] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. *Id.* The Renewed Order claims to minimize impacts by "limit[ing] operation of dispatched units to the times and within the parameters as determined by PJM pursuant" to the Renewed Order's "Paragraph A." Ex. 1 at 6. But Paragraph A contains only a command that PJM "take all measures necessary to ensure that the Eddystone Units are available to operate" and "employ economic dispatch . . . to minimize costs to ratepayers," and requires Constellation to comply with PJM's orders implementing those commands. *Id.* An instruction minimizing ratepayer costs and demanding availability has no

rational relationship to a requirement to minimize environmental impacts.  And the Renewed Order includes no measures that would mitigate impacts when compliance with environmental standards proves impracticable—measures that have been routinely included in past orders.  *See, e.g.,* Ex. 19 at 4 (DOE No. 202-17-4) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practicably available resources," including available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 10 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to inform affected communities" of non-compliant operations).  At a minimum the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized.  *See, e.g.,* Ex. 20 at 5 (DOE Order No. 202-24-1) (requiring detailed data on emissions of pollutants).  The Renewed Order here instead only requires "such additional information" as the Department, in the future, may (or may not) "request[] . . . from time to time."  Ex. 1 at 7.  That possibility of future, unspecified inquiry cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts.  16 U.S.C. § 824a(c)(2).

### c.  *The Department Has Not Demonstrated That It Conducted the Required Consultation or Adopted Conditions Thereafter*

Finally, there is no indication in the Renewed Order or elsewhere that the Department has, as Section 202(c)(4)(B) requires, "consult[ed] with the primary

Federal agency with expertise in the environmental interest protected" by the laws with which the Renewed Order may conflict. 16 U.S.C. § 824a(c)(4)(B). The Renewed Order serves as a renewal or re-issuance of the Department's Initial Order; its claimed basis is that '[t]he emergency conditions that led to the issuance of Order No. 202-25-4 continue." Ex. 1 at 2. *See id.* at 6 (basing order on claim that "the emergency conditions … supporting the issuance of Order No. 202-25-3 will continue"). But the Department has provided no evidence of consultation with the Environmental Protection Agency (or any other agency with expertise in the Eddystone's air and water pollution), *see, e.g.,* Ex. 21 at 2 (DOE Order No. 202-22-2 Amendment No. 1) (stating that "the Department consulted with EPA… and EPA did not request any additional conditions"); Ex. 22 at 2 (DOE Order No. 202-22-1 Amendment No. 2) (same); Ex. 19 at 9–10 (DOE Order No. 202-17-4) (including EPA consultation in public record). Nor is there any evidence of "[t]he conditions, if any, submitted" by EPA (or any other agency) following consultation, or "an explanation of [the Department's] determination" that such conditions "would prevent the [Renewed Order] from adequately addressing the emergency"—material that Section 202(c)(4)(B) requires the Department to make "available to the public." 16 U.S.C. § 824a(c)(4)(B); *see* Ex. 23 at 1 (made public by Department). If the Department has failed to consult and procure the required conditions, it has violated the statute. *Id.* If it has received and declined conditions, but refused to disclose them or to provide an explanation of why DOE does not believe any such conditions are necessary, that too violates the law. *Id.*

## VI. REQUEST FOR STAY

Public Interest Organizations further move the Department for a stay of the Renewed Order until the conclusion of judicial review. 18 C.F.R. § 385.212.[121] The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires." 5 U.S.C. § 705. In deciding whether to grant a request for stay, agencies consider: (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 434, 436 (2009); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g., Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO New Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987-88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at p. 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at p. 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later

---

[121] Pursuant to Federal Power Act Section 313 and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department Order. 16 U.S.C. § 825*l*(c), 18 C.F.R. § 385.713(e).

date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (quoting

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir.

1958)); *see also In re NTE Conn., LLC*, 26 F.4th at 990-91. Environmental injury,

however, "can seldom be adequately remedied by money damages and is often

permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently

likely, therefore, the balance of harms will usually favor the issuance of an

injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480

U.S. 531, 545 (1987).

## A. Intervenors Are Irreparably Harmed by the Order.

Here, a stay is necessary to ensure that Eddystone does not continue with

activities that are already causing irreparable harm to Public Interest

Organizations, their members, and the public as a result of the Renewed Order.[122]

Operating the Eddystone Units, which burn oil and natural gas, results in

emissions of dangerous air pollutants, including sulfur dioxide ("SO2"), nitrogen

oxides ("NOX"), particulate matter ("PM"), and carbon dioxide ("CO2") that would

not otherwise have occurred but for the Orders blocking the deactivation of the

Eddystone Units.[123] These pollutants cause and exacerbate respiratory problems,

cardiovascular issues, and other health conditions. These impacts are accentuated

---

[122] The Eddystone Units have in fact operated as a result of the Order. *See, e.g.,* Compliance Report, *supra* n. 20.

[123] *Id.*

by Eddystone's location in an area already disproportionately overburdened by heavily polluting industrial sources and toxic waste sites.[124]

The Renewed Order also causes irreparable harm by imposing costs on PJM ratepayers that would not otherwise be borne and will not be recoverable through litigation. Constellation is complying with the Renewed Order and according to PJM, will be compensated based on PJM's Deactivation Avoidable Cost Credit approach, which is already part of PJM's FERC-approved tariff for units retained for local reliability purposes.[125] PJM and Constellation have both taken the position that these costs are unreviewable by FERC.[126] FERC has approved PJM's proposal to allocate these costs to consumers throughout PJM. *PJM Interconnection, LLC*, 192 FERC ¶ 61,159 (Aug. 15, 2025).

The Department does not identify any clear recourse for a refund in the event the Renewed Order is declared unlawful. In forcing ratepayers to reopen and operate an uneconomic, unreliable, and obsolete resource that was already approved for closure, the Order also jeopardizes the diversification of generating resources the

---

[124] *See supra*, Section IV.A.

[125] *See* Letter from David E. Mills, Chair, PJM Board, to PJM Members and Stakeholders (June 26, 2025), 20250626-pjm-board-letter-re-results-of-the-cifp-process-for-doe-202-c-order-for-eddystone-units-3-and-4.pdf.

[126] *See* FERC Docket No. ER25-2653, Motion for Leave to Answer and Answer of PJM Interconnection LLC, filed July 18, 2015, at 17 ("in this case, where CEG and PJM have reached agreement on the rates that will apply to the relevant transactions, the Commission need not provide additional guidance or review."); FERC Docket No. ER25-2653, Motion for Leave to Answer and Answer of Constellation Energy Generation, LLC, filed July 18, 2025, at 4 ("Put simply, the FPA does not grant the Commission review authority where—like here—the parties have agreed to the terms of compensation.").

Department itself has said increases grid reliability and will inherently and unjustifiably add to ratepayer costs.[127]   As there is no clear recourse to recovering these costs from the Department should Public Interest Organizations prevail in their challenge, a stay pending judicial review is necessary to protect ratepayers from unwarranted energy cost increases-especially at a time when energy prices are already on the rise.[128]

### B. A Stay Would Not Result in Harm to Any Other Interested Parties.

No other interested parties would be harmed by a stay.  The issuance of a stay would not harm end-use electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity.  *See supra*, Section V.B.  Furthermore, because Constellation and PJM had both already planned for the closure of the Eddystone Units, a stay would only have the effect of relieving them of the administrative, compliance, and planning burdens imposed by the Order.  *See, e.g.,* Ex. 1 at 2-3.  On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

### C. A Stay is in the Public Interest.

There is no public interest served by the Renewed Order, and a stay will benefit the public.  First, the Renewed Order exceeds the Department's authority; it

---

[127] *See* U.S. Dep't of Energy, Energy Reliability and Resilience, https://www.energy.gov/eere/energy-reliability-and-resilience (last visited June 26, 2025).

[128] *See* Mitchell Terpstra, *2024 News Release: PJM Capacity Auction Prices Skyrocket*, Energy Choice Blog (Oct. 2, 2024), https://electricityrates.com/resources/pjm-capacity-auction-spike/.

has provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would justify the Eddystone Units' continued operation. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, a stay would protect the broader public—beyond Public Interest Organizations and their members—from the costs and additional pollution produced by unnecessary operation of the Eddystone Units.

## VII. CONCLUSION

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention; grant rehearing and rescind the Renewed Order (and any further renewals of it); and stay the Renewed Order.

*/s/ Caroline Reiser*                            September 26, 2025
Caroline Reiser
Simi Bhat
Gavin McCabe
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
creiser@nrdc.org
sbhat@nrdc.org
gmccabe@nrdc.org
(202) 717-8341

*/s/ Ted Kelly*
Ted Kelly
Tomás Carbonell
Environmental Defense Fund

555 12th St. NW, #400
Washington, DC 20004
tekelly@edf.org
tcarbonell@edf.org
(202) 387-3500

*/s/ Jessica O'Neill*
Jessica O'Neill
PennFuture
1429 Walnut Street, Suite 701
Philadelphia, PA 19102
oneill@pennfuture.org

*/s/ Danielle Fidler*
Danielle Fidler
Francis W. Sturges, Jr.
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
fsturges@catf.us
dfidler@catf.us
(617) 624-0234
*Counsel for Citizens for Pennsylvania's Future*

*/s/ Tyson Slocum*
Tyson Slocum
Public Citizen, Inc.
215 Pennsylvania Ave SE
Washington, DC 20003
(202) 454-5191
tslocum@citizen.org

*/s/ Gregory E. Wannier*
Gregory E. Wannier
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
(415) 977-5646

Exhibit C

# UNITED STATES OF AMERICA
## Department of Energy
Washington, DC 20585

PJM Interconnection, L.L.C.                              Order No. 202-25-8A
and Constellation Energy Corporation
Regarding the Eddystone Generating Station

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(October 28, 2025)

Rehearing has been timely requested of the Department of Energy's order issued on August 28, 2025, in the above-captioned matter.[1] Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

Chris Wright
Secretary of Energy

---

[1] *PJM Interconnection, L.L.C., and Constellation Energy Corp.*, Order No. 202-25-8 (2025) (regarding the Eddystone Generating Station).
[2] 16 U.S.C. § 825*l*(a).
[3] 16 U.S.C. § 825*l*(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).